**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| BARBARA FRONHEISER, Individually and as Administratrix of the Estate of JAMES HATT, Deceased; DONNA SCOTTI, Individually and as Executrix of the Estate of CATHERINE EDGINTON, Deceased, | Case No. |
| Plaintiffs, | |
| vs. | |
| PENNSYLVANIA DEPARTMENT OF MILITARY AND VETERANS AFFAIRS, as owner and operator of SOUTHEASTERN VETERANS' CENTER; ROHAN BLACKWOOD, in his individual capacity; and DEBORAH MULLANE, in her individual capacity, | |
| Defendants. | |

## PLAINTIFFS' COMPLAINT

AND NOW, come the Plaintiffs, Barbara Fronheiser, Individually and as Administratrix of the Estate of James Hatt, Deceased; and Donna Scotti, Individually and as Executrix of the Estate of Catherine Edginton, Deceased, by counsel, Robert F. Daley, Esquire; D. Aaron Rihn, Esquire; and the law firm of Robert Peirce & Associates, P.C.; and Daniel C. Levin, Esquire; and the law firm of Levin Sedran Berman, LLP, and claim damages of the Defendants, Pennsylvania Department of Military and Veterans Affairs, as owner and operator of Southeastern Veterans' Center; Rohan Blackwood, in his individual capacity; and Deborah Mullane, in her individual capacity, and allege the following in support:

1

## JURISDICTION AND VENUE

1.      This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as certain claims in this action arises under the Constitution of and laws of the United States.

2.      This Honorable Court has supplemental jurisdiction over the common law state claims pursuant to 28 U.S.C. § 1367.

3.      Venue is proper in this District under 28 U.S.C. § 1391(b) because all of the events, actions, and omissions giving rise to the within claims occurred in this District.

## PARTIES

### PERSONAL CARE HOME PLAINTIFF[1]
### James Hatt, Deceased

4.      Plaintiff Barbara Fronheiser is an adult individual with an address of 2401 Penn Avenue, West Lawn, Berks County, Pennsylvania 19606.

5.      Barbara Fronheiser is the sister of deceased James Hatt.

6.      James Hatt died on May 3, 2020 at the age of 73.

7.      Barbara Fronheiser was appointed the Administratrix of the Estate of James Hatt by the Director of the Department of Court Records of Berks County on November 17, 2021.

8.      As Administrator of the Estate of James Hatt, Barbara Fronheiser brings this action under 42 Pa. Cons. Stat. § 8302 (Survival) on behalf of the Estate of James Hatt.

9.      As the "personal representative" of the Estate of James Hatt, Barbara Fronheiser brings this action under 42 Pa. Cons. Stat. § 8301 (Wrongful Death) and Pa. R. Civ. P. 2202(a), on behalf of the estate of James Hatt. There are no individual wrongful death beneficiaries.

---

[1] All of the Plaintiffs named in this Complaint were residents of SEVC; however, different causes of actions are brought based upon whether the Plaintiffs were residents of SEVC's personal care home unit or its skilled nursing unit.

2

10.     At no time during his life did James Hatt bring an action to recover damages for his personal injuries, and no other action has been filed to recover damages for the wrongful death of James Hatt.

### SKILLED NURSING FACILITY PLAINTIFF:
#### Catherine Edginton

11.     Plaintiff Donna Scotti is an adult individual with an address of 376 Jefferson Court, Collegeville, Montgomery, Lancaster County, Pennsylvania 19426.

12.     Donna Scotti is the daughter of deceased Catherine Edginton.

13.     Catherine Edginton died on April 19, 2020 at the age of 84.

14.     Donna Scotti was appointed the Executrix of the Estate of Catherine Edginton by the Register of Wills for the County of Chester on October 21, 2021.

15.     As Executrix of the Estate of Catherine Edginton, Donna Scotti brings this action under 42 Pa. Cons. Stat. § 8302 (Survival) on behalf of the Estate of Catherine Edginton.

16.     As the "personal representative" of the Estate of Catherine Edginton, Donna Scotti brings this action under 42 Pa. Cons. Stat. § 8301 (Wrongful Death) and Pa. R. Civ. P. 2202(a) on her own behalf and on behalf of all wrongful death beneficiaries.

17.     The names and addresses of all persons legally entitled to recover damages for the wrongful death of Catherine Edginton and their relationships to her are as follows:

| Name | Address | Relationship |
|------|---------|--------------|
| Donna Scotti | 376 Jefferson Court<br>Collegeville, PA 19426 | Daughter |
| Wendy Belew | 8968 Big Oak Drive<br>Murfreesboro, TN 37129 | Daughter |
| Christopher Edginton | 14440 Slim Street<br>Milton, DE 19968 | Son |

18.     At no time during her life did Catherine Edginton bring an action to recover damages for her personal injuries, and no other action has been filed to recover damages for the wrongful death of Catherine Edginton.

## DEFENDANTS

### I.     Pennsylvania Department of Military and Veterans Affairs, as Owner and Operator of Southeastern Veterans' Center

19.     The Pennsylvania Department of Military and Veterans Affairs (hereinafter referred to as "DMVA") is a governmental agency operated by the Commonwealth of Pennsylvania, with government offices located at Building S-0-47, Fort Indiantown Gap, Annville, Lebanon County, Pennsylvania 17003.

20.     Defendant Southeastern Veterans' Center (hereinafter referred to as "SEVC") is a skilled nursing facility and personal care home located at 1 Veterans Drive, Spring City, Chester County, Pennsylvania 19475.

21.     At the time of the incidents pled herein, Defendant DMVA owned and operated Defendant SEVC as a long-term care facility and a personal care unit.

22.     DMVA and both its nursing facility/personal care home, SEVC, will collectively be referred to herein as "SEVC" for the remainder of this Complaint.

23.     SEVC provides skilled nursing services to our Commonwealth's veterans and their families.

24.     Additionally, SEVC maintains a personal care unit within the facility for veterans and their families.

25.     As such, SEVC provides personal care and personal care home medical services to our Commonwealth's veterans and their families.

26.     SEVC has a maximum capacity of 292 residents.[2]

27.     SEVC's employees and agents provide health care and medical services to veteran residents such as Plaintiffs.

28.     SEVC operates as a "health care facility" under Pennsylvania's Heath Care Facilities Act, 35 P.S. §448.801 *et. seq.* which "promote[s] the public health and welfare through the establishment and enforcement of regulations setting minimum standards in the construction, maintenance and operation of health care facilities."

29.     At all relevant times, SEVC was, and is, a "long term care nursing facility" as that term is defined in 35 P.S. §448.802(a).

30.     Accordingly, at all relevant times, SEVC was a "health care provider" as that term is defined in the Medical Care Availability and Reduction of Error Act (MCARE), 40 P.S. § 1303.503.

31.     As a "health care provider" under the MCARE Act, SEVC is a "licensed professional" as defined by Pennsylvania Rule of Civil Procedure 1042.1, and Plaintiffs are asserting professional liability claims, in addition to other claims against this Defendant.

32.     Additionally, at all relevant times, SEVC was, and is, a "personal care home" as that term is defined in 55 Pa. Code § 2600.4.

33.     However, SEVC also served as a medical health care provider for the residents within its personal care unit when it arranged for medical services, especially when the facility

---

[2] *Southeastern Veterans' Center,* DEPARTMENT OF MILITARY AND VETERANS AFFAIRS, COMMONWEALTH OF PENNSYLVANIA, https://www.dmva.pa.gov/paveteranshomes/SouthEasternVeteransCenter/Pages/default.aspx (last visited Oct. 12, 2020).

went into "lockdown" at the height of the COVID-19 pandemic, as the personal care home residents began getting severely ill, as more thoroughly pled herein.

34.    At all relevant times, SEVC was acting independently and by and through its authorized agents, servants and employees who were then and there acting within the course and scope of their employment.

## II. Rohan Blackwood

35.    Defendant Rohan Blackwood (hereinafter referred to as "Blackwood" and/or "Defendant Blackwood") is an adult individual, who was employed by SEVC as the facility's Commandant. Claims in this action are asserted against Defendant Blackwood in his individual capacity.

36.    Defendant Blackwood was hired as SEVC's Commandant in or around 2015.

37.    On May 16, 2020, Defendant Blackwood was placed on indefinite suspension from his position as Commandant at SEVC, in part based upon the facts pled herein.

38.    Defendant Blackwood acted at all relevant times hereto within the scope of his employment and in his professional capacity as the Commandant of SEVC.

39.    As the Commandant at SEVC, Defendant Blackwood was responsible for overseeing and managing the facility to provide care to residents in accordance with current and applicable federal, state, and local standards, guidelines, and regulations that govern long term care facilities.

40.    As the Commandant at SEVC, Defendant Blackwood was further responsible for ensuring that quality care was provided to all residents at all times.

41.    Defendant Blackwood was therefore a health care employee who was employed by the Defendant DMVA as owner and operator of SEVC.

6

### III. Deborah Mullane

42.     Defendant Deborah Mullane (hereinafter referred to as "Defendant Mullane" and/or "Mullane") is an adult individual, who was employed by SEVC as the facility's Director of Nursing. Claims in this action are asserted against Defendant Mullane in her individual capacity.

43.     Defendant Mullane was hired by SEVC to serve as the facility's Director of Nursing (hereinafter "DON") beginning some time before 2019.

44.     Defendant Mullane was placed on indefinite suspension from her position as DON on May 26, 2020, in part based upon the facts pled herein.

45.     Defendant Mullane acted at all relevant times hereto within the scope of her employment and in her professional capacity as the DON of SEVC.

46.     As the DON at SEVC, Defendant Mullane was responsible for planning, organizing, developing, and directing the overall operation of the nursing services department in accordance with current federal, state, and local standards, guidelines, and regulations that govern the facility.

47.     As the DON at SEVC, Defendant Mullane was also responsible for ensuring that quality care was provided to all residents at all times.

48.     Defendant Mullane was therefore a health care employee who was employed by the Defendant DMVA as owner and operator of SEVC.

### **FACTUAL ALLEGATIONS**

### **Personal Care Home Resident**
### **James Hatt, Deceased**

49.     James Hatt (hereinafter "Mr. Hatt") was admitted to SEVC for general nursing services and help caring for himself sometime between 2018 and 2019.

50.     Upon his admission, Mr. Hatt was admitted into SEVC's skilled nursing facility; however, he was transferred to the personal care unit of the facility approximately six months later.

51.     Throughout Mr. Hatt's time at SEVC, Mr. Hatt kept in regular contact with his sister, Mrs. Fronheiser.

52.     However, in April of 2020, in the height to the COVID-19 pandemic, Mrs. Fronheiser began to worry about Mr. Hatt's well-being when Mr. Hatt stopped answering Mrs. Fronheiser's calls, as he typically did every evening.

53.     Mrs. Fronheiser spoke to SEVC staff about her concerns, but she was informed that Mr. Hatt was just tired and sleeping. At no time did SEVC staff mention to Mr. Fronheiser that they suspected that Mr. Hatt had COVID-19 or that he was being tested.

54.     The last time Mrs. Fronheiser spoke to Mr. Hatt was on April 23, 2020 at approximately 2:00 p.m. During this call, Mrs. Fronheiser noticed that her brother sounded "off" and not like his typical self.

55.     Shortly thereafter, Mrs. Fronheiser received a call from SEVC staff informing her that Mr. Hatt had tested positive for COVID-19.

56.     After Mr. Hatt's COVID-19 diagnosis, Mrs. Fronheiser was able to have one video call with her brother. During this call, Mrs. Fronheiser was shocked by Mr. Hatt's appearance. His hair had grown past his shoulders, it appeared like he hadn't been showered in quite some time, he could not hold his own head up, and he was wearing only underwear.

57.     A few days after the video call, SEVC staff called Mrs. Fronheiser to inform her that SEVC staff wanted to transfer Mr. Hatt to the hospital due to his condition, but SEVC staff maintained that Mr. Hatt refused. Mrs. Fronheiser responded to this by requesting to speak to her

brother about going to the hospital, but SEVC staff indicated that Mr. Hatt was too weak to even speak on the phone.

58.     On May 3, 2020, Mr. Hatt died at SEVC.

59.     At this time, a nursing aide at SEVC called Mrs. Fronheiser to inform her that Mr. Hatt had passed away. The aide informed Mrs. Fronheiser that he pronounced Mr. Hatt dead himself because there were no doctors available at the facility to do so.

60.      Mr. Hatt's Death Certificate reflects that his cause of death was COVID-19 Associated Respiratory Disease.

### Skilled Nursing Resident
### Catherine Edginton

61.     Prior to Mrs. Edginton's admission into SEVC, Mrs. Edginton's husband was admitted into the facility. Thereafter, their family residence became too much for Mrs. Edginton to tend to on her own, which led to her admission into SEVC's personal care unit on November 10, 2015.

62.     On December 26, 2017, Mrs. Edginton was transferred to the facility's skilled nursing unit.

63.     From November 2015 until early 2020, Mrs. Edginton had a mostly unremarkable stay, only experiencing minor health concerns sporadically.

64.     However, in early April 2020, as COVID-19 swept through the facility, Mrs. Edginton's health quickly declined.

65.     While Mrs. Edginton's daughter and power of attorney, Donna Scotti ("Ms. Scotti"), was not informed of any symptoms of her mother's declining health until April 8, 2020, Mrs. Edginton's medical records reflect that Mrs. Edginton began experiencing symptoms of COVID-19 on April 6, 2020.

9

66.     Specifically, on April 6, 2020, Mrs. Edginton's occupational therapy was cancelled because Mrs. Edginton was "not feeling well" and had a fever.

67.     During this time, the unit where Mrs. Edginton resided was under quarantine as many of the residents tested positive for COVID-19.

68.     Two days later, Ms. Scotti was finally alerted that Mrs. Edginton had a "slight fever" and was congested.

69.     On this date, Mrs. Edginton's records reflect that Mrs. Edginton had a fever of 101.4, a headache, and was coughing up phlegm. Mrs. Edginton confirmed that she had not been feeling well for the past two days.

70.     A chest x-ray was performed on April 8, 2020, which confirmed that Mrs. Edginton had pneumonia in her right lower lobe. Accordingly, Mrs. Edginton was put on zithromycin and albuterol.

71.     Despite requests from Ms. Scotti, Mrs. Edginton was not tested for COVID-19.

72.     On April 9, 2021, Mrs. Edginton's cough intensified and her fever persisted at 101.

73.     Mrs. Edginton was adamant to both SEVC staff as well as her daughter via a phone conversation that she wanted to remain "FULL code" because "she fe[lt] strong enough to fight this."

74.     Again, on April 9, 2020, Ms. Scotti requested that her mother be tested for COVID-19. SEVC staff informed Ms. Scotti that Mrs. Edginton would not be tested for COVID-19; instead, SEVC declared Mrs. Edginton "presumptive[ly] positive" for COVID-19.

75.     On April 10, 2020, Mrs. Edginton's cough persisted, and it was documented that her lungs sounded diminished with rales on both sides.

76.     On April 11, 2020, Mrs. Edginton was placed on oxygen as her symptoms continued to rapidly affect her breathing.

77.     By the early morning on April 12, 2020, Mrs. Edginton was confirmed to have bilateral wheezing, abnormally rapid breathing, and a fever of 102.

78.     At this time, Mrs. Edginton was transported to Phoenixville Hospital and was admitted into the intensive care unit ("ICU"). On the same date of her admission into the hospital, April 12, 2020, Mrs. Edginton was tested for COVID-19.

79.     The next day, Mrs. Edginton's COVID-19 test confirmed that she was positive for the virus.

80.     On April 14, 2020, Mrs. Edginton was having such difficulty breathing that she was no longer able to eat or speak because the moment she was removed her oxygen mask, she was not able to breathe on her own.

81.     For the next several days, Mrs. Edginton's conditioned worsened.

82.     On April 19, 2020, Mrs. Edginton died at Phoenixville Hospital.

83.     Mrs. Edginton's Death Certificate reflects that her cause of death was pneumonia and COVID-19.

**Facts Common to All Causes of Action**

**I. SEVC's COVID-19 Outbreak**

84.     On March 6, 2020, in response to the rising concern of COVID-19, Pennsylvania Governor Tom Wolf issued an Emergency Order which required Pennsylvania residents to stay at home unless they were essential workers.

11

85.     At the same time, the Pennsylvania Department of Health ("DOH"), issued new guidelines for its inspection of nursing facilities.[3]

86.     First, the DOH suspended all "regular" on-site inspections of health care facilities, even for facilities that had previously been cited for violating infection-control regulations.

87.     Next, the DOH limited its complaint-based inspections to only those situations where a facility was putting a resident in "immediate jeopardy."[4] "Immediate jeopardy" was defined as when a nursing home's "noncompliance has placed the health and safety of recipients in its care at risk for serious injury, serious harm, serious impairment or death."[5]

88.     On March 9, 2020, SEVC placed its facilities on "lockdown" and visitors were no longer allowed inside the building to see residents.

89.     Notably, since the building was on lockdown, residents within the personal care unit were no longer able to leave the building. Accordingly, these residents depended on SEVC to, not only provide personal care services, but also to prevent them from contracting COVID-19, ensure they were healthy in their rooms, and provide medical care.

---

[3] The Pennsylvania Department of Health licenses skilled nursing facilities and long-term care facilities located in the Commonwealth of Pennsylvania. The DOH is also responsible for conducting regular and complaint-based inspections of the facilities it licenses to ensure that these facilities are complying with the mandatory requirements for operation. These mandatory requirements come from state and federal regulations that provide minimum standards for patient care. If the DOH finds that a nursing facility has violated a regulation, the DOH can issue a citation. A monetary fine may accompany this citation. The DOH will also require the nursing facility to submit a written plan to correct its deficiencies. The DOH will monitor the facility to ensure that deficiency is corrected.

[4] Candy Woodall, *As Coronavirus Deaths Increase, Pa. Nursing Homes Have Less State and Federal Oversight*, YORK DAILY RECORD (Apr. 24, 2020), https://www.ydr.com/story/news/2020/04/24/coronavirus-leads-pa-stop-routine-safety-inspections-nursing-homes/3016487001/.

[5] *State Operations Manuel Appendix Q – Core Guidelines for Determining Immediate Jeopardy*, CENTERS FOR MEDICARE AND MEDICAID SERVICES, (March 6, 2019) https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/som107ap_q_immedjeopardy.pdf.

90.     On March 18, 2020, SEVC informed the residents' families that there were no active cases of COVID-19 in the facility.

91.     However, twelve days earlier, SEVC staff informed another resident's son, who is a named plaintiff in the previously filed related case against SEVC, Ian Horowitz, that the facility learned of the first resident to test positive for COVID-19 on March 6, 2020.

92.      On March 31, 2020, SEVC, again, reassured the residents' families the facility did not have any COVID-19 positive residents and it was following guidelines to ensure that all residents were safe.

93.     However, all throughout the month of March, as the virus began to spread across the world, SEVC still forced residents to eat in the cafeteria together.

94.     Even residents who began showing symptoms of COVID-19 were brought into the cafeteria to eat with other residents, thus, exposing the greater group of residents.[6]

95.     Additionally, SEVC was not providing proper personal protective equipment to its employees; instead, employees working on the floors with infected residents were only given surgical masks, while administrators in offices used the protective N95 masks.[7]

96.     SEVC staff later reported that they were given one mask for every five shifts they worked; however, SEVC administrators told the staff not to wear the masks around residents because it would scare the residents.[8]

---

[6] Pa. Auditor General Eugene A. DePasquale, *Protecting Our Protectors: A Review of State Veterans Homes,* PENNSYLVANIA AUDITOR GENERAL, (Dec. 2, 2020) https://www.paauditor.gov/Media/Default/Reports/RPT_DMVA_120220_FINAL.pdf [herein "Pa. Auditor General Report"].
[7] William Bender et al., *Inept Boss, Altered Records, Ignored Warnings at Pa. Vets' Nursing Home with 38 COVID Deaths,* THE PHILADELPHIA INQUIRER, (last updated May 30, 2020), https://www.inquirer.com/news/southeastern-veterans-center-coronavirus-deaths-chester-county-nursing-home-rohan-blackwood-20200530.html.
[8] Pa. Auditor General Report, *supra* note 5.

13

97.     On April 4, 2020, SEVC notified families that "one or more resident(s)" tested positive for COVID-19.

98.     At the beginning of April, SEVC closed the cafeteria, but instead opened small recreation rooms for all of the residents to eat together on each floor.

99.     Shortly thereafter, on April 17, 2020, the PHILADELPHIA INQUIRER released an article entitled: "Coronavirus has killed at least 10 at a state-run veteran's home in Chester County. The National Guard is on site."[9]

100.    The above-mentioned article is how the residents' families first learned about the COVID-19 deaths at SEVC, as the facility did not notify, update, or inform any of the families regarding the spread of the virus.

101.    The PHILADELPHIA INQUIRER informed the public that between April 9, 2020 and April 15, 2020, COVID-19 deaths within SEVC had climbed from one resident to nine residents, and the tenth resident died a few short days later. By mid-April, as many as four residents were dying per day.[10]

102.    During this same time frame, nineteen SEVC staff members also tested positive for the virus.

103.    On Wednesday April 15, 2020, the National Guard sent 30 members into SEVC in an attempt to help the facility stop the spread of the virus.

104.    While the number of infected staff and residents began to rise, SEVC implemented a procedure to halt the testing of residents who resided in a unit with two or more COVID-19

---

[9] Bender et al., *supra* note 7.
[10] Bender et al., *supra* note 7.

positive residents. SEVC determined that all residents within these units, whether they had symptoms or not, were "presumed" to be positive, notwithstanding the absence of tests.

105.    On April 18, 2020, SEVC sent an email to the residents' families stating that the facility had "several positive cases of COVID-19 in our building," but the facility did not disclose any of the numerous deaths that had occurred. In this email, SEVC stated that "if any resident test positive here at the home, the family will immediately be notified."

106.    By April 19, 2020, the Chester County Coroner confirmed that Chester County had fifty-two COVID-19 deaths, thirty-two of those deaths occurred between April 10, 2020 and April 16, 2020.

107.    On April 19, 2020 the Centers for Medicare & Medicaid Services (hereinafter "CMS") announced new regulatory requirements for nursing homes, which required facilities to inform all residents and their families of COVID-19 cases within their facilities. CMS then reported those cases to the Centers for Disease Control and Prevention (hereinafter "CDC").[11]

108.    By April 26, 2020, SEVC had twenty-seven COVID-19 deaths—the most of any nursing facility in Chester County. By these statistics, SEVC's death toll nearly tripled in a 5-day period.

109.    On April 28, 2020, state and local officials began calling for an "immediate investigation" into SEVC's handling of COVID-19. These officials included: Senator Katie Muth,

---

[11] Press Release, CENTERS FOR MEDICARE & MEDICAID SERVICES, *Trump Administration Announces New Nursing Homes COVID-19 Transparency Effort* (Apr. 19, 2020), https://www.cms.gov/newsroom/press-releases/trump-administration-announces-new-nursing-homes-covid-19-transparency-effort.

the Chester County Coroner, Christina VandePol, and State Auditor General, Eugene DePasquale.[12]

110.    A statement released by Senator Katie Muth on April 28, 2020 follows:

> The situation at the Southeast Veterans is absolutely unacceptable. For the last three weeks, I've received calls and emails from concerned family members, worried about their loved ones, asking questions about what's being done to stop further spread of this virus. Long-term care facilities, like SEVC, are struggling to keep the virus from infecting both residents and staff, and with inadequate testing capacity and unreliable supply chains for personal protective equipment (PPE), this struggle becomes even more challenging.  There are many unanswered questions about the surge of cases and deaths at the center, and without answers of substance, it's clear that the current plan is failing.[13]

111.    Also, on April 28, 2020, Coroner VandePol was quoted stating:

> "The sheer number of deaths at the Veterans' Center in such a short period of time warrants an immediate investigation. We have no idea what is going on there or how this outbreak is being handled. Are all COVID-19 deaths being reported to us, as they should be by law? It appears that since Monday, April 27, they are no longer being reported to my office. Are there deaths written off as due to other causes because the residents are not being tested? Are appropriate safety precautions in place for residents and staff? I've been informed the State has suspended inspections of long-term care facilities as well as ombudsman programs. Families have little or no access to their loved ones, either. So, this is a closed system with no one able to see what is going on. That's a recipe for disaster."[14]

---

[12] Vinny Vella & William Bender, THE PHILADELPHIA INQUIRER, '*We Have No Idea What Is Going on There': Pa. and Local Officials Call for Probe of Veterans' Nursing Home* (Apr. 28, 2020), https://www.inquirer.com/news/southeastern-veterans-center-cheter-county-investigation-seniors-covid-coronavirus-20200428.html.

[13] Press Release, SENATOR KATIE MUTH, *State Sen. Muth, Chester County Coroner VandePol Call for Immediate Investigation into Chester County Southeast Veterans Center amidst Growing COVID-19 Concerns* (Apr. 28, 2020), https://www.senatormuth.com/state-sen-muth-chester-county-coroner-vandepol-call-for-immediate-investigation-into-chester-county-southeast-veterans-center-amidst-growing-covid-19-concerns/ [hereinafter Senator Muth Press Release].

[14] Bender et al., *supra* note 7.

112.    On April 29, 2020, Senator Muth shared that she had been in contact with SEVC staff. Staff disclosed to Muth that the facility falsified documents, improperly tested residents and staff, lacked isolation for positive residents, and intimidated staff in an effort to prevent them from alerting officials regarding the reality of SEVC's handling of the virus.[15]

113.    Following the growing concern from families and state officials, SEVC's Commandant, Defendant Blackwood, held a staff meeting forbidding any staff from speaking to Senator Muth or with any family member who has spoken to the media.

114.    After Defendant Blackwood's intimidation of the staff at the meeting, staff members were fearful of being fired if they spoke about the conditions within SEVC.[16]

115.    Residents' families were fearful of retaliation from Defendant Blackwood as well because he had a history among residents' families of threating them if they questioned his authority.[17]

116.    On May 2, 2020, Defendant Blackwood sent a letter to the residents' families which stated that the media had misrepresented the situation inside of the facility, and SEVC attempted to reassure the residents' families that their loved ones were safe.

117.    Furthermore, SEVC was vastly understaffed before and during the COVID-19 pandemic. Many attributed the understaffing to Defendant Blackwood and the working conditions he created.[18]

---

[15] Jeff Cole, Fox 29 Philadelphia, *Officials Call For "Immediate Investigation" of Chester County Nursing Home over COVID-19 Concerns,* Fox 29 Philadelphia, (Apr 29, 2020), https://www.fox29.com/news/officials-call-for-immediate-investigation-of-chester-county-nursing-home-over-covid-19-concerns.
[16] Bender et al., *supra* note 7.
[17] Bender et al., *supra* note 7.
[18] Bender et al., *supra* note 7.

118.    As the facility's number of positive COVID-19 residents continued to rise, on May 12, 2020, Pennsylvania Attorney General Josh Shapiro announced that his office had opened criminal investigations into "several nursing homes," but did not specify how many facilities, which facilities, or any specific allegations.

119.    On May 21, 2020, plaintiff in a related matter, Ian Horowitz, received a call from Michael Collins of the Pennsylvania Attorney General's Office (hereinafter "AG's Office"). Mr. Collins explained to Mr. Horowitz that the AG's Office wanted to speak with SEVC's staff in order to collect more information regarding the state of SEVC; therefore, Mr. Collins asked that Mr. Horowitz give his contact information for SEVC's staff to the AG's Office.

120.    As of May 20, 2020, SEVC had forty-seven COVID-19 deaths, all of which occurred after April 1, 2020. The death rate at SEVC during this time is drastically higher than the facility's average rate of 1.2 deaths per month.[19]

121.    On May 20, 2020, SEVC sent a letter to the residents' families which stated that it began to test all residents and staff for COVID-19.

122.    However, staff informed Mr. Horowitz that the facility was not actually testing the residents as the letter claimed.

123.    On May 23, 2020, SEVC sent an email to the residents' families informing them that ninety-nine residents and forty-one staff members had tested positive for COVD-19.

124.    On May 26, 2020, SEVC Commandant, Rohan Blackwood, and the Director of Nursing, Deborah Mullane, were both placed on indefinite suspension from the facility.

---

[19] Evan Brandt, *Despite High Death Roll, Inspections Reveal No Missteps at Southeast Veterans Center,* THE MERCURY, (Apr 29, 2020), https://www.pottsmerc.com/news/despite-high-death-roll-inspections-reveal-no-missteps-at-southeast-veterans-center/article_a894a32a-9096-11ea-b786-a7878ba4dcaf.html.

125.     By May 30, 2020, SEVC had over 110 COVID-19 positive residents between its skilled nursing facility and its personal care unit.

126.     Tom Tosti, an officer of the American Federation of State, County, and Municipal Employees ("AFSCME"), the union that represents VA facility nurses, stated that the State Bureau of Veterans Homes began investigating complaints made in April of 2020 regarding working conditions, but interviews took longer than expected and had to be relocated, as staff were afraid that they would be fired for speaking with investigators.

127.     As of October 14, 2020, the Department of Human Services reported that SEVC's personal care unit had a total of 25 COVID-19 positive residents, of which, 6 residents died.[20]

128.     As of December 8, 2020, the DOH reported that SEVC's skilled nursing facility had a total of 111 COVID-19 positive residents, of which, 42 residents died.[21]

129.     The DOH reported that SEVC had 71 COVID-19 positive employees as of December 8, 2020.[22]

130.     Statistically, SEVC's COVID-19 numbers are an outlier when compared to other state-run veteran's facilities. The Department of Veterans Affairs has five other facilities within the Commonwealth. Pursuant to the December 8, 2020, each of the five other state-run facilities have fewer than fifteen COVID-19 related deaths.

---

[20] COVID-19 Personal Care and Assisted Living Data—*COVID-19 Cases Associated with Nursing Homes and Personal Care Homes to Date by Facility Name,* DEPARTMENT OF HEALTH AND HUMAN SERVICES (Sept. 15, 2020), https://sais.health.pa.gov/CommonPOC/Content/PublicWeb/PDF/PQ881191346361000L.PDF [hereinafter DHS COVID Personal Care Data].

[21] COVID-19 Long-Term Care Facility Data-- *COVID-19 Cases Associated with Nursing Homes and Personal Care Homes to Date by Facility Name,* DEPARTMENT OF HEALTH AND HUMAN SERVICES (Dec. 8, 2020), https://sais.health.pa.gov/CommonPOC/Content/PublicWeb/PDF/PQ881191346361000L.PDF [hereinafter DOH COVID Long-Term Care Data].

[22] DOH COVID Long-Term Care Data, *supra* note 20.

## II. The Department of Health Investigation

131.    Following numerous complaints about SEVC's handling of COVID-19, the Pennsylvania Department of Health conducted an on-site inspection of SEVC over the course of several days, concluding on June 9, 2020.

132.    The DOH's inspection included reviewing SEVC's written policies and procedures, observing staff providing care to residents, and interviewing staff.

133.    As a result of this inspection, the DOH cited SEVC for numerous infractions and deficiencies, including SEVC's non-compliance with federal requirements for infection control. The DOH found that SEVC "failed to implement the CMS and CDC recommended practices for COVID-19 and to prevent the potential for cross contamination of infection."[23]

134.    The DOH determined the following:

> the facility failed to ensure that policies and procedure were in place to trace and investigate COVID-19 presumptive positive and positive residents and staff to mitigate or potentially control the spread of the coronavirus, failed to follow CDC (Center for Disease Control) guidelines, CMS (Center for Medicare/Medicaid Services) guidelines and Pennsylvania Department of Health (DOH) guidelines to reduce the spread of infections and prevent cross-contamination during the COVID-19 pandemic…[24]

135.    The DOH also concluded that 128 of the 154 residents in the facility were in "Immediate Jeopardy."[25]

136.    The DOH reported the following from its interviews and observations of SEVC employees:

---

[23] *DOH Statement of Deficiencies and Plan of Correction (POC)*, DEPARTMENT OF HEALTH AND HUMAN SERVICES HEALTH CARE FINANCING ADMINISTRATION (June 9, 2020), https://sais.health.pa.gov/CommonPOC/Content/PublicWeb/PDF/PQ881191346361000L.PDF [hereinafter DOH POC] (Attached as Exhibit 1).
[24] DOH POC, *supra* note 21, Ex. 1.
[25] DOH POC, *supra* note 21, Ex. 1.

a.      "An observation on June 1, 2020, at 8:10 a.m. of the screening process revealed no social distancing at the entrance to the building and no screening questionnaire form was used by the security guard at the entrance to the building."

b.      "Interview on June 1, 2020, at 9:55 a.m. with the Infection Preventionist (Employee 2) revealed that not all of the staff had been fit tested [A process in which people who are required to wear negative-pressure respirators (i.e. N95) are examined with a rigorous protocol in which the tester challenges the face-to-face piece seal with a chemical agent]."

c.      "June 2, 2020, at 8:20 a.m. interview with the Acting Commandant revealed CDC guidelines were not followed when residents who were tested positive and after timeline (14 days) were left on a positive unit. There was no tracing or tracking in place."

d.      "Interview with NA 3 on June 2, 2020, at 10:15 a.m. confirmed that staff have been pulled from positive to negative units and back the same day. NA 3 stated, 'Sometimes when I come in there isn't any PPE. I know they have it, but why do we have to beg for stuff that we have to wear, or we get PDC'd (Preliminary Disciplinary Committee). We had to take care of positive residents without being fit tested. The fit testing just started a week ago.'"

e.      "During an interview with LPN 2 on June 2, 2020, at 10:25 a.m. it was stated, 'that we will be fired for talking to you. Watching people die was awful. We were told to wrap the residents in a body bag and meet the undertaker at the elevator.'"

f.      "NA 3 went on to say no one from administration came on the floor because they didn't want to put gear on. What makes them better than us? There was a girl who was positive and worked the entire time. They also kept the residents in the dining rooms too long. We had problems, we knew some residents had something, but no one would do anything. We weren't allowed to wear PPE, or we would get written up. We were told it would scare the residents."

21

g.      "On June 2, 2020, at 10:35 a.m. an interview with NA 4 revealed that she observed Employee 2 enter a positive room with no gown and mask on. Then was off for two weeks."

h.      "NA 2 revealed that no testing was done before April 5, 2020, because of arrogance. Resident 4A and Resident 13A were first tested. I tested positive on April 10, 2020, but back at work on April 12, 2020."

i.      "During an interview with NA 2, she was asked, are you to be wearing a mask? NA [2]'s [sic] response was "I was hot, so I took it off. I just masked up and I can't breathe." The 4 CLC B is a COVID-19 positive unit."

137.    The DOH cited SEVC for the following violations:

a.      Maintaining residents on units with COVID-19 positive residents when their testing was negative;

b.      Failing to have a policy or protocol for the management of COVID-19 positive and negative residents;

c.      Placing male and female residents in the same room without notifying or receiving consent from responsible parties;

d.      Failing to ensure that resident's representatives were notified about changes in condition and treatment;

e.      Failing to maintain clinic records that were complete and accurately documented, specifically staff documented COVID-19 testing in the wrong residents' files;

f.      Failing to ensure that designated interdisciplinary team member obtained the required information from the contracted hospice provider;

g.      Failing to make certain, prior to the COVID-19 outbreak, that the Commandant, Defendant Blackwood, and Director of Nursing, Defendant Mullane, were in attendance for quarterly Quality Assurance Process Improvement Committee meetings for two of four quarters, specifically July 2019 and April 2020;

h.      Failing to ensure that policies and procedures were in place to trace and investigate COVID-19 presumptive positive and

positive residents and staff to mitigate or potentially control the spread of COVID;

i.     Failing to follow CDC, CMS, and DOH guidelines to reduce the spread of infections and prevent cross contamination;

j.     Failing to test residents and staff at all prior to April 5, 2020;

k.     Failing to end communal dining before April 1, 2020;

l.     Failing to adequately test staff, specifically only 21% of staff had been tested since May 28, 2020;

m.     Failing to follow proper social distancing protocols at entrance of the facility and failed to have security use a screening questionnaire for entrance;

n.     Failing to properly fit test all staff with protective N95 masks; and,

o.     Allowing employees to work on both COVID-19 positive and negative units during the same day.

138.    The DOH additionally determined that the Commandant, Defendant Blackwood, and the Director of Nursing, Defendant Mullane, "did not effectively manage the facility to make certain that proper infection control procedures were followed to protect residents from cross-contamination, infection, virus, and disease in the facility."[26]

139.    The DOH concluded that the Commandant, Defendant Blackwood, and the Director of Nursing, Defendant Mullane, "failed to fulfill their essential job duties to ensure that the federal and state guidelines and regulations were followed."[27]

140.    Commandant, Defendant Blackwood, and the Director of Nursing, Defendant Mullane, failed to fulfill their essential job duties to ensure that federal and state guidelines and

---

[26] DOH POC, *supra* note 21, Ex. 1.
[27] DOH POC, *supra* note 21, Ex. 1.

regulations were followed. They also failed to maintain an infection prevention and control program which placed residents in immediate jeopardy.[28]

141.   More specifically, Defendant Blackwood and Defendant Mullane:

a.   Failed to ensure proper screening of staff entering the building;

b.   Failed to implement tracing and investigation of positive COVID-19 residents and staff;

c.   Failed to ensure that multi-use equipment was properly cleaned and disinfected; and,

d.   Failed to ensure staff had access to and used proper PPE, used proper hand-hygiene, and properly stored/handled linens to prevent the potential for cross contamination of disease.[29]

142.   As evidenced above, the DOH found that SEVC failed to have proper policies and procedures in place regarding infection prevention prior to the COVID-19 pandemic, failed to have proper staffing in place prior to the COVID-19 pandemic, and failed to have proper leadership prior to the COVID-19 pandemic, and, as a result, these aforementioned failures led to the mishandling of the pandemic and resulted in SEVC putting 128 of the 154 residents in "immediate jeopardy."[30]

## COUNT I:
## VIOLATION OF CIVIL RIGHTS ENFORCEABLE PURSUANT TO 42 U.S.C. § 1983 –
## Cruel and Unusual Punishment

### All Plaintiffs vs. Rohan Blackwood

143.   The averments of the previous paragraphs are incorporated by reference as if fully set forth.

---

[28] Senator Muth Press Release, *supra* note 13.
[29] DOH POC, *supra* note 21, Ex. 1.
[30] DOH POC, *supra* note 21, Ex. 1.

144.    Section 1983 provides that: "every person who, under color of [law] of any State. . . subjects, or causes to be subjected, any [person] to the deprivation of any rights. . . secured by the Constitution and laws, shall be liable to the party injured in an action at law. . ." 42 U.S.C. § 1983.

145.    Actions against state officials seeking redress for violations of constitutional rights may be brought under 42 U.S.C. § 1983.

146.    The Plaintiffs' Decedents were "persons" within the meaning of 42 U.S.C. § 1983.

147.    Defendant Blackwood acted in his official capacity as Commandant of SEVC, a state-run facility, and was, therefore, acting under the color of state law. Defendant Blackwood's actions and inactions violated Plaintiffs' Decedents' Eighth Amendment rights, made applicable to the states under the Fourteenth Amendment, which is actionable under 42 U.S.C. § 1983.

148.    Under the Eighth Amendment to the United States Constitution, made applicable to the states pursuant to the Fourteenth Amendment, government agencies are prohibited from subjecting citizens to cruel and unusual punishment. Actions of government officials demonstrating deliberate indifference to the serious medical needs of U.S. citizens represents cruel and unusual punishment, as established in *Estelle v. Gamble,* 429 U.S. 97 (1976).

149.    Residents of skilled nursing facilities, specifically including Plaintiffs' Decedents herein, rely on the facility, and therefore on the facility's administrators, to attend to their medical needs. Similarly, residents of personal care facilities, specifically including Plaintiffs' Decedents herein, also rely on the facility and the facility's administrators to attend to their medical needs.

150.    Under normal circumstances, if necessary, residents of skilled nursing facilities and/or personal care facilities could leave the facility to seek medical care if adequate care was not being properly provided by the facility.

151.    However, during the COVID-19 pandemic, and at all times relevant hereto, residents, including Plaintiffs' Decedents, were not permitted exit the facility due to lockdown procedures.

152.    Furthermore, the families of residents, including Plaintiffs, were not permitted to enter the building to check on the level of care their loved ones were receiving.

153.    As such, nursing and personal care staff of SEVC were the sole providers of medical services to skilled and personal care residents during the lockdown periods from early March until very recently or even presently.

154.    Residents had absolutely no ability to seek, solicit, or find alternative medical care when the Defendants failed to provide adequate and basic care, or often failed to provide care altogether, which ultimately amounted to cruel and unusual punishment under the Eighth Amendment, made actionable under the Fourteenth Amendment.

155.    The actions of Defendant Blackwood detailed above violated Plaintiffs' and Decedents' rights under the United States Constitution. In short, it was not objectively reasonable for Defendant Blackwood to ignore the serious medical problems and risks presented by the COVID-19 outbreak among a vulnerable population and refuse to take appropriate and necessary measures to prevent such an outbreak. In fact, Defendant Blackwood's actions demonstrate a deliberate indifference to Plaintiffs' Decedents' serious medical needs.

156.    There should have been policies and procedures in place, both before and during the pandemic, to ensure that Plaintiffs' Decedents' medical needs, along with all other SEVC residents' needs, were being properly considered and evaluated. All of the aforementioned deficiencies establish not only deliberate indifference on the part of Defendant Blackwood, but

actual malice with respect to Plaintiffs' Decedents' life-threatening, and ultimately fatal, medical conditions.

157.     Defendant Blackwood intentionally ignored and/or was deliberately indifferent to the need for appropriate policies and procedures of SEVC's the handling of COVID-19. Further, he intentionally ignored Plaintiffs' Decedents' needs for medical attention. Defendant Blackwood intentionally deprived Plaintiffs' Decedents of their constitutional right to medical treatment which ultimately caused their deaths. The actions and inactions of Defendant Blackwood represent a violation of Plaintiffs' and Decedents' rights under the Eighth Amendment to the United States Constitution.

158.     Defendants Blackwood's actions were motivated by bad faith and malice as he intentionally subjected the Plaintiffs' Decedents to the spread of the virus, and he willfully denied Plaintiffs' Decedents timely medical assistance after they became ill which could have saved their lives.

159.     The aforementioned deliberate indifference to Plaintiffs' Decedents' serious medical needs was consistent with SEVC's custom and policy of providing inadequate medical care to residents, which was developed and implemented by Defendant Blackwood.

160.     The deliberate indifference of the Defendant Blackwood included, but was not limited to the following:

a.      Intentionally failing to establish and maintain a policies and procedures to prevent the spread of COVID-19;

b.      Intentionally understaffing the facility;

c.      Failing to implement social distancing procedures among residents, staff, and visitors;

d.      Failing to implement any sort of quarantine procedures when residents were showing symptoms of the virus or were exposed to the virus;

e.      Failing to assess and treat the symptoms of sick residents;

f.      Failing to send residents to the hospital when their conditions worsened;

g.      Failing to notify families of residents' changing conditions;

h.      Failing to notify families regarding the status of the spread of the virus within the facility;

i.      Lying to the families regarding the number of sick residents in the facility;

j.      Lying to the families by stating their loved ones were healthy while the residents were showing severe symptoms of the virus;

k.      Instructing staff to lie to families regarding residents' conditions;

l.      Instructing staff to not allow any resident to go to the hospital despite the urgency of the residents' conditions;

m.      Denying staff members personal protective equipment;

n.      Denying residents personal protective equipment;

o.      Refusing to permit staff to speak to families and/or the media/public regarding the status of the virus within the facility;

p.      Refusing to permit staff to speak to the Pennsylvania Department of Health;

q.      Failing to properly keep families, outside medical professionals, the Pennsylvania Department of Health, and the general public up to date with the health situation inside the facility;

r.      Failing to test any resident within the facility for COVID-19 for several weeks;

s.   Failing to track the contact spread of the virus;

t.   Creating an extreme risk of exposure and danger to residents by presuming the entire facility, all residents, and all staff were positive for COVID-19 when in fact they were not all infected;

u.   Failing to test employees within the facility;

v.   Moving employees from COVID-19 positive floors to COVID-19 negative floors within the same shift;

w.   Falsifying records;

x.   Intentionally failing to provide adequate staff training and education on infection prevention and control;

y.   Failing to oversee the facility in providing care to residents; and,

z.   Failing to request assistance from the proper authorities when it became apparent that COVID-19 was spreading throughout the facility.

161.   As a direct and proximate result of the unconstitutional acts as described above, Plaintiffs' Decedents were irreparably injured and ultimate died as a result of Defendant Blackwood's actions.

WHEREFORE, Plaintiffs, Barbara Fronheiser, Individually and as Administratrix of the Estate of James Hatt, Deceased, and Donna Scotti, Individually and as Executrix of the Estate of Catherine Edginton, Deceased, claim damages of Defendant Rohan Blackwood, in his individual capacity, and demand compensatory and punitive damages from the Defendant in an amount in excess of the jurisdictional arbitration limits, together with interest, and any other relief this Honorable Court deems appropriate.

## COUNT II:
## <u>VIOLATIONS OF CIVIL RIGHTS ENFORCEABLE PURSUANT TO 42 U.S.C. § 1983 –</u>
## <u>Cruel and Unusual Punishment</u>

### All Plaintiffs vs. Deborah Mullane

162.    The averments of the previous paragraphs are incorporated by reference as if fully set forth.

163.    Section 1983 provides that: "every person who, under color of [law] of any State. . . subjects, or causes to be subjected, any [person] to the deprivation of any rights. . . secured by the Constitution and laws, shall be liable to the party injured in an action at law. . ." 42 U.S.C. § 1983.

164.    Actions against state officials seeking redress for violations of constitutional rights may be brought under 42 U.S.C. § 1983.

165.    The Plaintiffs' Decedents were "persons" within the meaning of 42 U.S.C. § 1983.

166.    Defendant Mullane acted in her official capacity as DON of SEVC, a state-run facility, and was, therefore, acting under the color of state law. Defendant Mullane's actions and inactions violated Plaintiffs' Decedents' Eighth Amendment rights, made applicable to the states under the Fourteenth Amendment, which is actionable under 42 U.S.C. § 1983.

167.    Under the Eighth Amendment to the United States Constitution, made applicable to the states pursuant to the Fourteenth Amendment, government agencies are prohibited from subjecting citizens to cruel and unusual punishment. Actions of government officials demonstrating deliberate indifference to the serious medical needs of U.S. citizens represents cruel and unusual punishment, as established in *Estelle v. Gamble,* 429 U.S. 97 (1976).

168.    Residents of skilled nursing facilities, specifically including Plaintiffs' Decedents herein, rely on the facility, and therefore on the facility's administrators, to attend to their medical

needs. Similarly, residents of personal care facilities, specifically including Plaintiffs' Decedents herein, also rely on the facility and the facility's administrators to attend to their medical needs.

169.     Under normal circumstances, if necessary, residents of skilled nursing facilities and/or personal care facilities could leave the facility to seek medical care if adequate care was not being properly provided by the facility.

170.     However, during the COVID-19 pandemic, and at all times relevant hereto, residents, including Plaintiffs' Decedents, were not permitted to exit the facility due to lockdown procedures.

171.     Furthermore, the families of residents, including Plaintiffs, were not permitted to enter the building to check on the level of care their loved ones were receiving.

172.     As such, nursing and personal care staff were the sole providers of medical services to skilled and personal care residents during the lockdown periods from early March until very recently or even presently.

173.     Residents had absolutely no ability to seek, solicit, or find alternative medical care when the Defendants failed to provide adequate and basic care, or often failed to provide care altogether, which ultimately amounted to cruel and unusual punishment under the Eighth Amendment, made actionable under the Fourteenth Amendment.

174.     The actions of Defendant Mullane detailed above violated Plaintiffs' Decedents' rights under the United States Constitution. In short, it was not objectively reasonable for Defendant Mullane to ignore the serious medical problems and risks presented by the COVID-19 outbreak among a vulnerable population and refuse to take appropriate and necessary measures to prevent such an outbreak. In fact, Defendant Mullane's actions demonstration a deliberate indifference to Plaintiffs' Decedents' serious medical needs.

31

175.    There should have been policies and procedures in place, both before and during the pandemic, to ensure that Plaintiffs' Decedents' medical needs, along with all other SEVC residents' needs, were being properly considered and evaluated. All of the aforementioned deficiencies establish not only deliberate indifference on the part of Defendant Mullane, but actual malice with respect to Plaintiffs' Decedents' life-threatening, and ultimately fatal, medical conditions.

176.    Defendant Mullane intentionally ignored and/or was deliberately indifferent to the need for appropriate policies and procedures within SEVC for the handling of COVID-19. Further, she intentionally ignored Plaintiffs' Decedents' needs for medical attention. Defendant Mullane intentionally deprived Plaintiffs' Decedents of their constitutional right to medical treatment which ultimately caused their deaths. The actions and inactions of Defendant Mullane represent a violation of Plaintiffs' and Decedents' rights under the Eighth Amendment to the United States Constitution.

177.    Defendants Mullane's actions were motivated by bad faith and malice as she intentionally subjected the Plaintiffs' Decedents to the spread of the virus, and she willfully denied Plaintiffs' Decedents timely medical assistance after they became ill, which could have saved their lives.

178.    The aforementioned deliberate indifference to Plaintiffs' Decedents' serious medical needs was consistent with SEVC's custom and policy of providing inadequate medical care to residents, which was developed and implemented by Defendant Mullane.

179.    The deliberate indifference of the Defendant Mullane included, but was not limited to the following:

        a.      Intentionally failing to establish and maintain a policies and
                procedures to prevent the spread of COVID-19;

b.      Intentionally understaffing the facility;

c.      Failing to implement social distancing procedures among residents, staff, and visitors;

d.      Failing to implement any sort of quarantine procedures when residents were showing symptoms of the virus or were exposed to the virus;

e.      Failing to assess and treat the symptoms of sick residents;

f.      Failing to send residents to the hospital when their conditions worsened;

g.      Failing to notify families of residents' changing conditions;

h.      Failing to notify families regarding the status of the spread of the virus within the facility;

i.      Lying to the families regarding the number of sick residents in the facility;

j.      Lying to the families by stating their loved ones were healthy while the residents were showing severe symptoms of the virus;

k.      Instructing staff to lie to families regarding residents' conditions;

l.      Instructing staff to not allow any resident to go to the hospital despite the urgency of the residents' conditions;

m.      Denying staff members personal protective equipment;

n.      Denying residents personal protective equipment;

o.      Refusing to permit staff to speak to families and/or the media/public regarding the status of the virus within the facility;

p.      Refusing to permit staff to speak to the Pennsylvania Department of Health;

q.      Failing to properly keep families, outside medical professionals, the Pennsylvania Department of Health, and

33

the general public up to date with the health situation inside the facility;

r.      Failing to test any resident within the facility for COVID-19 for several weeks;

s.      Failing to track the contact spread of the virus;

t.      Creating an extreme risk of exposure and danger to residents by presuming the entire facility, all residents, and all staff were positive for COVID-19 when in fact they were not all infected;

u.      Failing to test employees within the facility;

v.      Moving employees from COVID-19 positive floors to COVID-19 negative floors within the same shift;

w.      Falsifying records;

x.      Intentionally failing to provide adequate staff training and education on infection prevention and control;

y.      Failing to oversee the facility in providing care to residents; and,

z.      Failing to request assistance from the proper authorities when it became apparent that COVID-19 was spreading throughout the facility.

180.    As a direct and proximate result of the unconstitutional acts as described above, Plaintiffs' Decedents were irreparably injured and ultimate died as a result of Defendant Mullane's actions.

WHEREFORE, Plaintiffs, Barbara Fronheiser, Individually and as Administratrix of the Estate of James Hatt, Deceased, and Donna Scotti, Individually and as Executrix of the Estate of Catherine Edginton, Deceased, claim damages of Defendant Deborah Mullane, in her individual capacity, and demand compensatory and punitive damages from the Defendant in an amount in

excess of the jurisdictional arbitration limits, together with interest, and any other relief this Honorable Court deems appropriate.

## COUNT III:
## DEPRAVATION OF CIVIL RIGHTS PROTECTED UNDER FEDERAL NURSING HOME REFORM ACT ("FNHRA")

**Donna Scotti, Individually and as Executrix
of the Estate of Catherine Edginton, Deceased
vs.
Rohan Blackwood**

181.    The averments of the previous paragraphs are incorporated by reference as if fully set forth.

182.    Defendant Blackwood was an agent of the Commonwealth of Pennsylvania via his position as Commandant of SEVC, a facility operated by the Department of Veterans Affairs. Accordingly, at all times material hereto, Defendant Blackwood was acting under color of state law.

183.    Defendant Blackwood is bound generally by the 1987 Omnibus Budget Reconciliation Act ("OBRA") and the Federal Nursing Home Reform Act ("FNHRA"), which is contained within the 1987 OBRA. *See:* 42 U.S.C. § 1396r; 42 U.S.C. § 1396a(w) (as incorporated by 42 U.S.C. § 1396(r).) Defendant Blackwood is also bound generally by the OBRA/FNHRA implementing regulations found at 42 C.F.R. § 483, *et seq.*, which served to define specific statutory rights set forth in the above-mentioned statutes.

184.    The specific detailed regulatory provisions as well as the statutes in question create rights for Plaintiff's Decedent, which are enforceable pursuant to 42 U.S.C. § 1983, as the language of these regulations and statutory provisions clearly and unambiguously creates those rights.

185.    Defendant Blackwood, in derogation of the above statute and regulations, and as a custom and policy, failed to comply with the aforementioned regulations as follows:

a.  By failing, as a custom and policy, to ensure that residents, including Plaintiff's Decedent, did not suffer verbal, physical and mental abuse as required by 42 U.S.C.A. § 1396r(c)(1)(A)(ii) and amplified by 42 C.F.R. § 483.13(b), as pled herein;

b.  By failing, as a custom and policy, to care for residents, including Plaintiff's Decedent, in a manner that promoted maintenance or enhancement of her life, as required by 42 U.S.C.A. § 1396r(b)(1)(A), as pled herein;

c.  By failing, as a custom and policy, to develop a comprehensive plan of care for residents, including Plaintiff's Decedent, to meet the residents' medical, nursing, and psychosocial needs, as required by 42 U.S.C.A. § 1396r(b)(2)(A) and amplified by 42 C.F.R. §483.20(b), as pled herein;

d.  By failing, as a custom and policy, to provide residents, including Plaintiff's Decedent, the necessary care and services to allow them to attain or maintain the highest, practicable, physical, mental and psychosocial well-being, as required 42 U.S.C.A. § 1396r(b)(2) and amplified by 42 C.F.R. § 483.25, as pled herein;

e.  By failing, as a custom and policy, to periodically review and revise resident's written plan of care by an interdisciplinary team after each of the resident's assessments, as described within 42 U.S.C.A. §1396r(b)(3)(A) and as required by 42 U.S.C.A. § 1396r(b)(2)(C), as pled herein;

f.  By failing, as a custom and policy, to conduct an assessment of residents, such as Plaintiff's Decedent, promptly after a significant change in the resident's physical or mental condition occurs, as required by 42 U.S.C.A. §1396r(b)(3)(A) and 42 U.S.C.A. §1396r(b)(3)(C)(i)(II), as pled herein;

g.  By failing, as a custom and policy, to use the results of the assessments required and as described above in developing, reviewing and revising the residents' plan of care, such as Plaintiff's Decedent, as required by 42 U.S.C.A. § 1396r(b)(3)(D), as pled herein;

h.    By failing, as a custom and policy, to ensure that residents, including Plaintiff's Decedent, were provided medically-related social services to attain or maintain the highest practicable physical, mental and psychosocial well-being, as required by 42 U.S.C.A. § 1396r(b)(4)(ii), as pled herein;

i.    By failing, as a custom and policy, to ensure that residents, including Plaintiff's Decedent, were provided proper nutrition, as required by 42 U.S.C.A. § 1396r(b)(4)(A)(iv) and amplified by 42 C.F.R. § 483.25(g), as pled herein;

j.    By failing, as a custom and policy, to ensure that an ongoing program, directed by a qualified professional, of activities designed to meet the interests and the physical, mental and psychosocial well-being of each resident, including Plaintiff's Decedent, as required by 42 U.S.C.A. § 1396r(b)(4)(A)(v), as pled herein;

k.    By failing, as a custom and policy, to ensure that the personnel responsible for the care of residents, including Plaintiff's Decedent, were qualified to perform necessary services, as required by 42 U.S.C.A. § 1396r(b)(4)(B), as pled herein;

l.    By failing, as a custom and policy, to provide sufficient nursing staff to provide 24-hour nursing and related services sufficient to meet the nursing needs of the residents, including Plaintiff's Decedent, as required by 42 U.S.C.A. § 1396r(b)(4)(C), as pled herein;

m.    By failing, as a custom and policy, to maintain clinical records on all residents, including Plaintiff's Decedent, including, but not limited to the plans of care and resident's assessment, as required by 42 U.S.C.A. § 1396r(b)(6)(C), as pled herein;

n.    By failing, as a custom and policy, to keep the residents, including Plaintiff's Decedent, fully informed about care and treatment and changes in care or treatment that may affect the residents' well-beings, as required by 42 U.S.C.A. § 1396r(c)(1)(A)(i), as pled herein.

o.    By failing, as a custom and policy, to protect and promote the rights of residents, including Plaintiff's Decedent, to be free from physical or chemical restraints imposed for the purpose of discipline or convenience and not required to

37

treat the resident's medical symptoms, as required by 42 U.S.C.A. § 1396r(c)(1)(A)(ii), as pled herein;

p.    By failing, as a custom and policy, to ensure that the SEVC facility was administrated in a manner that enabled it to use its resources effectively and efficiently to allow residents, including Plaintiff's Decedent, to maintain or attain their highest practicable level of physical, mental and psychosocial well-being as required by 42 U.S.C.A. § 1396r(d)(1)(A), as pled herein; and,

q.    By failing, as a custom and policy, to ensure that the SEVC was complying with federal, state, local laws, and accepted professional standards which apply to professionals providing services to residents, including Plaintiffs' Decedents, and in operating such a facility as SEVC, as required by 42 U.S.C.A. § 1396r(d)(4)(A), as pled herein.

186.    Further evidence of the systematic violations of these rights, and that the violations of these rights were part of a "custom and policy" as evidenced by the inspection report prepared by the DOH as a result of inspections of the facility. The DOH records are attached and incorporated by reference as Exhibit 1 to this Complaint. *See* Ex. 1.

187.    The DOH records clearly establish that the violations of these rights were not limited to singular and isolated incidents, but rather were part of a much broader and more consistent "custom and policy" of Defendant Blackwood to violate residents' rights.

188.    Specifically, the DOH found that 128 of 154 residents were in immediate jeopardy. This widespread endangerment goes to the gravity of Defendant Blackwood's systemic failures to maintain a safe facility for SEVC's residents.

189.    This custom and policy includes a DOH record indicating that, after an investigation which occurred on June 9, 2020, there was a citation issued to Defendant in regards to the care given to Plaintiff, when the facility failed to, among other things, properly implement the CMS and CDC recommended practices for COVID-19 and failed to prevent the potential for

cross-contamination of infection, specifically leading to the death of more than 42 skilled nursing residents, including Plaintiff's Decedent.

190.    As a proximate result of Defendant Blackwood's actionable derogation of his regulatory and statutory responsibilities as above-described, Plaintiff's Decedent was injured as previously referenced, and suffering pain, distress and death as a result of the poor care, treatment, and management, which exposed them to COVID-19, as described herein. As such, Plaintiff's Decedent suffered, and is entitled to recover the following damages, as well as an award of reasonable counsel fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988:

    a.    Pain, suffering, inconvenience, anxiety and nervousness of Plaintiff until the time of her death;

    b.    Hospital, medical, surgical and nursing expenses incurred on Plaintiff's death; and,

    c.    Other losses and damages permitted by law.

WHEREFORE, Plaintiff Donna Scotti, Individually and as Executrix of the Estate of Catherine Edginton, Deceased, claims damages against Defendant Rohan Blackwood, in his individual capacity, and demands compensatory and punitive damages from the Defendant in an amount in excess of the jurisdictional arbitration limits, together with interest, and any other relief this Honorable Court deems appropriate.

## COUNT IV:
## DEPRAVATION OF CIVIL RIGHTS PROTECTED UNDER FEDERAL NURSING HOME REFORM ACT ("FNHRA")

**Donna Scotti, Individually and as Executrix**
**of the Estate of Catherine Edginton, Deceased**
**vs.**
**Deborah Mullane**

191.    The averments of the previous paragraphs are incorporated by reference as if fully set forth.

192.    Defendant Mullane was an agent of the Commonwealth of Pennsylvania via her position as DON of SEVC, a facility operated by the Department of Veterans Affairs. Accordingly, at all times material hereto, Defendant Mullane was acting under color of state law.

193.    Defendant Mullane is bound generally by the 1987 Omnibus Budget Reconciliation Act ("OBRA") and the Federal Nursing Home Reform Act ("FNHRA"), which is contained within the 1987 OBRA. *See:* 42 U.S.C. § 1396r; 42 U.S.C. § 1396a(w) (as incorporated by 42 U.S.C. § 1396(r).) Defendant Blackwood is also bound generally by the OBRA/FNHRA implementing regulations found at 42 C.F.R. § 483, *et seq.*, which served to define specific statutory rights set forth in the above-mentioned statutes.

194.    The specific detailed regulatory provisions as well as the statutes in question create rights for Plaintiff's Decedent, which are enforceable pursuant to 42 U.S.C. § 1983, as the language of these regulations and statutory provisions clearly and unambiguously creates those rights.

195.    Defendant Mullane, in derogation of the above statute and regulations, and as a custom and policy, failed to comply with the aforementioned regulations as follows:

    a.    By failing, as a custom and policy, to ensure that residents, including Plaintiff's Decedent, did not suffer verbal, physical and mental abuse as required by 42 U.S.C.A. § 1396r(c)(1)(A)(ii) and amplified by 42 C.F.R. § 483.13(b), as pled herein;

    b.    By failing, as a custom and policy, to care for residents, including Plaintiff's Decedent, in a manner that promoted maintenance or enhancement of their lives, as required by 42 U.S.C.A. § 1396r(b)(1)(A), as pled herein;

    c.    By failing, as a custom and policy, to develop a comprehensive plan of care for residents, including Plaintiff's Decedent, to meet the residents' medical, nursing, and psychosocial needs, as required by 42 U.S.C.A. § 1396r(b)(2)(A) and amplified by 42 C.F.R. §483.20(b), as pled herein;

d.   By failing, as a custom and policy, to provide residents, including Plaintiff's Decedent, the necessary care and services to allow them to attain or maintain the highest, practicable, physical, mental and psychosocial well-being, as required 42 U.S.C.A. § 1396r(b)(2) and amplified by 42 C.F.R. § 483.25, as pled herein;

e.   By failing, as a custom and policy, to periodically review and revise resident's written plan of care by an interdisciplinary team after each of the resident's assessments, as described within 42 U.S.C.A. §1396r(b)(3)(A) and as required by 42 U.S.C.A. § 1396r(b)(2)(C), as pled herein;

f.   By failing, as a custom and policy, to conduct an assessment of residents, such as Plaintiff's Decedent, promptly after a significant change in the resident's physical or mental condition occurs, as required by 42 U.S.C.A. §1396r(b)(3)(A) and 42 U.S.C.A. §1396r(b)(3)(C)(i)(II), as pled herein;

g.   By failing, as a custom and policy, to use the results of the assessments required and as described above in developing, reviewing and revising the residents' plan of care, such as Plaintiff's Decedent, as required by 42 U.S.C.A. § 1396r(b)(3)(D), as pled herein;

h.   By failing, as a custom and policy, to ensure that residents, including Plaintiff's Decedent, were provided medically-related social services to attain or maintain the highest practicable physical, mental and psychosocial well-being, as required by 42 U.S.C.A. § 1396r(b)(4)(ii), as pled herein;

i.   By failing, as a custom and policy, to ensure that residents, including Plaintiff's Decedent, were provided proper nutrition, as required by 42 U.S.C.A. § 1396r(b)(4)(A)(iv) and amplified by 42 C.F.R. § 483.25(g), as pled herein;

j.   By failing, as a custom and policy, to ensure that an ongoing program, directed by a qualified professional, of activities designed to meet the interests and the physical, mental and psychosocial well-being of each resident, including Plaintiff's Decedent, as required by 42 U.S.C.A. § 1396r(b)(4)(A)(v), as pled herein;

k.   By failing, as a custom and policy, to ensure that the personnel responsible for the care of residents, including

Plaintiff's Decedent, were qualified to perform necessary services, as required by 42 U.S.C.A. § 1396r(b)(4)(B), as pled herein;

l.    By failing, as a custom and policy, to provide sufficient nursing staff to provide 24-hour nursing and related services sufficient to meet the nursing needs of the residents, including Plaintiff's Decedent, as required by 42 U.S.C.A. § 1396r(b)(4)(C), as pled herein;

m.    By failing, as a custom and policy, to maintain clinical records on all residents, including Plaintiff's Decedent, including, but not limited to the plans of care and resident's assessment, as required by 42 U.S.C.A. § 1396r(b)(6)(C), as pled herein;

n.    By failing, as a custom and policy, to keep the residents, including Plaintiff's Decedent, fully informed about care and treatment and changes in care or treatment that may affect the residents' well-beings, as required by 42 U.S.C.A. § 1396r(c)(1)(A)(i), as pled herein;

o.    By failing, as a custom and policy, to protect and promote the rights of residents, including Plaintiff's Decedent, to be free from physical or chemical restraints imposed for the purpose of discipline or convenience and not required to treat the resident's medical symptoms, as required by 42 U.S.C.A. § 1396r(c)(1)(A)(ii), as pled herein;

p.    By failing, as a custom and policy, to ensure that the SEVC facility was administrated in a manner that enabled it to use its resources effectively and efficiently to allow residents, including Plaintiff's Decedent, to maintain or attain their highest practicable level of physical, mental and psychosocial well-being as required by 42 U.S.C.A. § 1396r(d)(1)(A), as pled herein; and,

q.    By failing, as a custom and policy, to ensure that the SEVC was complying with federal, state, local laws, and accepted professional standards which apply to professionals providing services to residents, including Plaintiff's Decedent, and in operating such a facility as SEVC, as required by 42 U.S.C.A. § 1396r(d)(4)(A), as pled herein.

196.    Further evidence of the systematic violations of these rights, and that the violations of these rights were part of a "custom and policy" as evidenced by the inspection report prepared by the DOH as a result of inspections at the facility. The DOH records are attached and incorporated by reference as Exhibit 1 to this Complaint. *See* Ex. 1.

197.    The DOH records clearly establish that the violations of these rights were not limited to singular and isolated incidents, but rather were part of a much broader and more consistent "custom and policy" of Defendant Mullane to violate residents' rights.

198.    Specifically, the DOH found that 128 of 154 residents were in immediate jeopardy. This widespread endangerment goes to the gravity of Defendant Mullane's systemic failures to maintain a safe facility for SEVC's residents.

199.    This custom and policy includes a DOH record indicating that, after an investigation which occurred on June 9, 2020, there was a citation issued to Defendant in regards to the care given to Plaintiff, when the facility failed to, among other things, properly implement the CMS and CDC recommended practices for COVID-19 and failed to prevent the potential for cross-contamination of infection, specifically leading to the death of more than 42 skilled nursing residents, including Plaintiff's as pled herein.

200.    As a proximate result of Defendant Mullane's actionable derogation of her regulatory and statutory responsibilities as above-described, Plaintiffs were injured as previously referenced, and suffering pain, distress and death as a result of the poor care, treatment, and management, which exposed them to COVID-19, as described herein. As such, Plaintiff's Decedent suffered, and is entitled to recover the following damages, as well as an award of reasonable counsel fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988:

        a.    Pain, suffering, inconvenience, anxiety and nervousness of Plaintiff until the time of her death;

      b.      Hospital, medical, surgical and nursing expenses incurred on Plaintiff's death; and,

      c.      Other losses and damages permitted by law.

WHEREFORE, Plaintiff Donna Scotti, Individually and as Executrix of the Estate of Catherine Edginton, Deceased, claims damages against Defendant Deborah Mullane, in her individual capacity, and demands compensatory and punitive damages from the Defendant in an amount in excess of the jurisdictional arbitration limits, together with interest, and any other relief this Honorable Court deems appropriate.

## COUNT V:
## <u>NEGLIGENCE</u>

**Donna Scotti, Individually and as Executrix
of the Estate of Catherine Edginton, Deceased
vs.
Rohan Blackwood**

201.    The averments of the previous paragraphs are incorporated by reference as if fully set forth.

202.    At all relevant times, Defendant Blackwood acted within the course and scope of his employment as Commandant at SEVC.

203.    Defendant Blackwood is a "Commonwealth party" as described in 42 Pa. C.S.A. § 8522 who oversaw and provided medical care to SEVC residents; therefore, Defendant Blackwood is liable to Plaintiffs for damages under the medical-professional liability exception to sovereign immunity.

204.    Defendant Blackwood had a duty to act prudently and had a duty to provide reasonable and ordinary care and services Plaintiff's Decedent and all other SEVC residents.

205.    Defendant Blackwood had a duty to oversee all persons who practice medicine within SEVC's facility.

206.    Defendant Blackwood had a duty to formulate, adopt, and enforce adequate rules and policies to ensure quality care for residents such as Plaintiff's Decedent.

207.    Defendant Blackwood negligently, recklessly, carelessly, and wantonly breached the duties owed to Plaintiff's Decedent in the following ways:

    a.    By inadequately and improperly training and educating to caregiving staff on infection prevention and control, as pled herein;

    b.    By inadequately and improperly ensuring all caregiving staff members attended and were properly trained on infection prevention and control, and by inadequately ensuring all staff were properly re-educated as required; as pled herein;

    c.    By disseminating untrue information and/or withholding some or all relevant information from residents and their families about the spread of COVID-19 within SEVC, so as to prevent them from making informed decisions for the wellbeing of their loved ones in SEVC, as pled herein;

    d.    By inadequately and improperly enforcing safe social distancing among staff and residents, as pled herein;

    e.    By inadequately and improperly and improperly storing linens and soiled laundry, as pled herein;

    f.    By inadequately and improperly ensuring all employees properly wore gloves and performed hand hygiene, as pled herein;

    g.    By inadequately and improperly ensuring all employees knew of and properly followed guidelines for sanitizing medical equipment in between uses on different residents, as pled herein.

    h.    By inadequately and improperly ensuring all employees properly used PPE and were trained on proper use of PPE, as pled herein;

  i.  By inadequately and improperly ensuring all residents properly used PPE and were instructed on the proper use of PPE, as pled herein;

  j.  By inadequately and improperly quarantining sick residents and residents who were exposed to other residents who were experiencing symptoms of COVID-19, as pled herein;

  k.  By preventing residents and staff from receiving testing for COVID-19 for a period of several months, as pled herein;

  l.  By preventing sick residents from being transferred to the hospital, as pled herein;

  m.  By implementing a policy that considered all residents and staff were "presumed positive" whether or not they were experiencing symptoms, as pled herein;

  n.  By lying to the families regarding the status of the virus within the facility, as pled herein;

  o.  By preventing staff from speaking freely to the families and/or media about the status of COVID-19 within the facility and threatening staff about termination if staff spoke freely; and,

  p.  By lying to the residents' families regarding the condition of their loved ones, as pled herein.

208. At all relevant times, Rohan Blackwood, as Commandant at SEVC, had a duty to not violate the legal rights of any resident and to comply with all provisions of Title 28, Pa. Administrative Code, Chapters 201 (General Operation of Long-Term Care Nursing Facilities) and 211 (Program Standards for Long-Term Care Nursing Facilities) and 42 C.F.R. §483 *et seq.* (Centers for Medicare & Medicaid Services, Department of Health and Human Services Requirements for Long Term Care Facilities).

209. These state and federal regulations comprise part of the standard of care that facilities like SEVC must provide to its residents.

210.    These state and federal regulations are designed and intended to protect the interests of skilled nursing and long-term care residents such as the Plaintiff's Decedent.

211.    These state and federal regulations are designed and intended to protect the interests of skilled nursing and long-term care residents against the hazards Plaintiff's Decedent encountered at SEVC and the type of harm she suffered – specifically, contracting viral infections from other residents and/or staff and ultimately dying from the virus.

212.    Defendant Blackwood negligently, recklessly, carelessly, and wantonly violated these state and federal regulations in the following ways:

    a.    By inadequately assessing the appropriateness of the medical services provided to SEVC's residents, as required by 28 Pa. Code § 211.2(c), as pled herein;

    b.    By inadequately and improperly reviewing incidents occurring in SEVC and addressing the health and safety hazards of the facility, as required by 28 Pa. Code § 211.2(d)(1), as pled herein;

    c.    By withholding appropriate information from SEVC's Administrator, and/or DON, in order to ensure a safe and sanitary environment for residents and personnel, as required by 28 Pa. Code § 211.2(d)(1), as pled herein;

    d.    By improperly implementing resident care policies, as required by 42 C.F.R. 483.70(h), as pled herein; and,

    e.    By inadequately and improperly coordinating medical care in SEVC, as required by 42 C.F.R. § 483.70(h), as pled herein.

213.    As a direct and proximate result of the negligent, reckless, careless, and wanton actions and inactions of Defendant Blackwood, as set forth above, Plaintiff's Decedent suffered the following damages:

    a.    The Plaintiff's Decedent experienced pain, suffering, infirmity, deterioration, debilitation, loss of enjoyment of life, anxiety, and isolation/confinement from contracting and being treated for the COVID-19; and,

b. The Plaintiff's Decedent incurred hospital, medical, and nursing expenses to be treated for the COVID-19 virus and its sequelae and effects.

214. Furthermore, because the negligence of Defendant Blackwood went beyond ordinary negligence into gross negligence, recklessness, and wanton conduct, Plaintiff is entitled to recover punitive damages.

215. Defendant DMVA as owner and operator of SEVC is vicariously liable for the acts and omissions of Defendant Blackwood, as set forth in this Count, and are therefore jointly and severally liable for the damages claimed herein.

WHEREFORE, Plaintiff Donna Scotti, Individually and as Executrix of the Estate of Catherine Edginton, Deceased, claims damages against Defendant Rohan Blackwood, in his individual capacity, and demands compensatory and punitive damages from the Defendant in an amount in excess of the jurisdictional arbitration limits, together with interest, and any other relief this Honorable Court deems appropriate.

## COUNT VI:
## NEGLIGENCE

**Donna Scotti, Individually and as Executrix
of the Estate of Catherine Edginton, Deceased
vs.
Deborah Mullane**

216. The averments of the previous paragraphs are incorporated by reference as if fully set forth.

217. At all relevant times, Defendant Mullane acted within the course and scope of her employment as the DON at SEVC.

218. Defendant Mullane is a "Commonwealth party" as described in 42 Pa. C.S.A. § 8522 who oversaw and provided medical care to SEVC residents; therefore, Defendant Mullane is

48

liable to Plaintiffs for damages under the medical-professional liability exception to sovereign immunity.

219.   Defendant Mullane had a duty to act prudently and had a duty to provide reasonable and ordinary care and services Plaintiff's Decedent and all other SEVC residents.

220.   Defendant Mullane had a duty to ensure that all persons providing care within SEVC were competent to provide such care.

221.   Defendant Mullane negligently, recklessly, carelessly, and wantonly breached the duties owed to Plaintiff's Decedent in the following ways:

> a.   By inadequately and improperly training and educating to caregiving staff on infection prevention and control, as pled herein;
>
> b.   By inadequately and improperly ensuring all caregiving staff members attended and were properly trained on infection prevention and control, and by inadequately ensuring all staff were properly re-educated as required; as pled herein;
>
> c.   By disseminating untrue information and/or withholding some or all relevant information from residents and their families about the spread of COVID-19 within SEVC, so as to prevent them from making informed decisions for the wellbeing of their loved ones in SEVC, as pled herein;
>
> d.   By inadequately and improperly enforcing safe social distancing among staff and residents, as pled herein;
>
> e.   By inadequately and improperly and improperly storing linens and soiled laundry, as pled herein;
>
> f.   By inadequately and improperly ensuring all employees properly wore gloves and performed hand hygiene, as pled herein;
>
> g.   By inadequately and improperly ensuring all employees knew of and properly followed guidelines for sanitizing medical equipment in between uses on different residents, as pled herein.

h.   By inadequately and improperly ensuring all employees properly used PPE and were trained on proper use of PPE, as pled herein;

i.   By inadequately and improperly ensuring all residents properly used PPE and were instructed on the proper use of PPE, as pled herein;

j.   By inadequately and improperly quarantining sick residents and residents who were exposed to other residents who were experiencing symptoms of COVID-19, as pled herein;

k.   By preventing residents and staff from receiving testing for COVID-19 for a period of several months, as pled herein;

l.   By preventing sick residents from being transferred to the hospital, as pled herein;

m.   By implementing a policy that considered all residents and staff were "presumed positive" whether or not they were experiencing symptoms, as pled herein;

n.   By lying to the families regarding the status of the virus within the facility, as pled herein;

o.   By preventing staff from speaking freely to the families and/or media about the status of COVID-19 within the facility and threatening staff about termination if staff spoke freely; and,

p.   By lying to the residents' families regarding the condition of their loved ones, as pled herein.

222.   At all relevant times, Defendant Mullane, as DON at SEVC, had a duty to not violate the legal rights of any resident and to comply with all provisions of Title 28, Pa. Administrative Code, Chapters 201 (General Operation of Long-Term Care Nursing Facilities) and 211 (Program Standards for Long-Term Care Nursing Facilities) and 42 C.F.R. §483 *et seq.* (Centers for Medicare & Medicaid Services, Department of Health and Human Services Requirements for Long Term Care Facilities).

223.    These state and federal regulations comprise part of the standard of care that facilities like SEVC must provide to its residents.

224.    These state and federal regulations are designed and intended to protect the interests of skilled nursing and long-term care residents such as the Plaintiff's Decedent.

225.    These state and federal regulations are designed and intended to protect the interests of skilled nursing and long-term care residents against the hazards Plaintiff's Decedent encountered at SEVC and the type of harm she suffered – specifically, contracting viral infections from other residents and/or staff and ultimately dying from the virus.

226.    Defendant Mullane negligently, recklessly, carelessly, and wantonly violated these state and federal regulations in the following ways:

    a.    By inadequately assessing the appropriateness of the medical services provided to SEVC's residents, as required by 28 Pa. Code § 211.2(c), as pled herein;

    b.    By inadequately and improperly reviewing incidents occurring in SEVC and address the health and safety hazards of the facility, as required by 28 Pa. Code § 211.2(d)(1), as pled herein;

    c.    By withholding appropriate information to SEVC Administrators in order to ensure a safe and sanitary environment for residents and personnel, as required by 28 Pa. Code § 211.2(d)(1), as pled herein;

    d.    By improperly implementing resident care policies, as required by 42 C.F.R. 483.70(h), as pled herein; and,

    e.    By inadequately and improperly coordinating medical care in SEVC, as required by 42 C.F.R. § 483.70(h), as pled herein.

227.    As a direct and proximate result of the negligent, reckless, careless, and wanton actions and inactions of Defendant Mullane, as set forth above, Plaintiff's Decedent suffered the following damages:

a. Plaintiff's Decedent experienced pain, suffering, infirmity, deterioration, debilitation, loss of enjoyment of life, anxiety, and isolation/confinement from contracting and being treated for the COVID-19; and,

b. Plaintiff's Decedent incurred hospital, medical, and nursing expenses to be treated for the COVID-19 virus and its sequelae and effects.

228.    Furthermore, because the negligence of Defendant Mullane went beyond ordinary negligence into gross negligence, recklessness, and wanton conduct, Plaintiff is entitled to recover punitive damages.

229.    Defendant DMVA as owner and operator of SEVC is vicariously liable for the acts and omissions of Defendant Mullane, as set forth in this Count, and are therefore jointly and severally liable for the damages claimed herein.

WHEREFORE, Plaintiff Donna Scotti, Individually and as Executrix of the Estate of Catherine Edginton, Deceased, claims damages against Defendant Deborah Mullane, in her individual capacity, and demands compensatory and punitive damages from the Defendant in an amount in excess of the jurisdictional arbitration limits, together with interest, and any other relief this Honorable Court deems appropriate.

## COUNT VII:
## NEGLIGENCE

**Barbara Fronheiser, Individually and as Administratrix
of the Estate of James Hatt, Deceased
vs.
Rohan Blackwood**

230.    The averments of the previous paragraphs are incorporated by reference as if fully set forth.

231.    At all relevant times, Defendant Blackwood acted within the course and scope of his employment as the Commandant at SEVC.

232.    Defendant Blackwood is a "Commonwealth party" as described in 42 Pa. C.S.A. § 8522 who oversaw and provided medical care, both personal and nursing services, to SEVC residents, including those on the fourth-floor personal care home unit; therefore, Defendant Blackwood is liable to Plaintiff for damages under the medical-professional liability exception to sovereign immunity.

233.    Defendant Blackwood had a duty to act prudently and had a duty to provide reasonable and ordinary care and care services to Plaintiff's Decedent and all other SEVC residents.

234.    Defendant Blackwood had a duty to ensure that all persons providing care within SEVC were competent to provide that care.

235.    Blackwood had a duty to formulate, adopt, and enforce adequate rules and policies to ensure quality care for residents such as Plaintiff's Decedent.

236.    Defendant Blackwood negligently, recklessly, carelessly, and wantonly, breached the duties owed to Plaintiff's Decedent in the following particulars:

   a.    By inadequately and improperly training and educating to caregiving staff on infection prevention and control, as pled herein;

   b.    By inadequately and improperly ensuring all caregiving staff members attended and were properly trained on infection prevention and control, and by inadequately ensuring all staff were properly re-educated as required; as pled herein;

   c.    By disseminating untrue information and/or withholding some or all relevant information from residents and their families about the spread of COVID-19 within SEVC, so as to prevent them from making informed decisions for the wellbeing of their loved ones in SEVC, as pled herein;

   d.    By inadequately and improperly enforcing safe social distancing amongst staff and residents, as pled herein;

e.      By inadequately and improperly and improperly storing linens and soiled laundry, as pled herein;

f.      By inadequately and improperly ensuring all employees properly wore gloves and performed hand hygiene, as pled herein;

g.      By inadequately and improperly ensuring all employees knew of and properly followed guidelines for sanitizing medical equipment in between uses on different residents, as pled herein.

h.      By inadequately and improperly ensuring all employees properly used PPE and were trained on proper use of PPE, as pled herein;

i.      By inadequately and improperly ensuring all residents properly used PPE and were instructed on the proper use of PPE, as pled herein;

j.      By inadequately and improperly quarantining sick residents and residents who were exposed to other residents who were experiencing symptoms of COVID-19, as pled herein;

k.      By inadequately and improperly testing residents or staff for COVID-19 for a period of several months, as pled herein;

l.      By preventing sick residents from being transferred to the hospital, as pled herein;

m.      By implementing a policy that considered all residents and staff were "presumed positive" whether or not they were experiencing symptoms, as pled herein;

n.      By lying to the families regarding the status of the virus within the facility, as pled herein;

o.      By preventing the staff from speaking freely to the families and/or the media about the status of COVID-19 within SEVC and threatening termination of the staff if they spoke freely, as pled herein; and,

p.      By lying to the residents' families regarding the condition of their loved ones, as pled herein.

237.   At all relevant times, Defendant Blackwood, as Commandant for SEVC, in addition to other duties set forth herein, had a duty to not violate the legal rights of any resident and had a duty to comply with all provisions of Title 55 of the Pennsylvania Administrative Code, Chapter § 2600.

238.   The above noted regulations are designed and intended to provide part of the standard of care by which personal care homes such as SEVC should operate.

239.   These regulations are designed and intended to protect the interests of residents, such as Plaintiff's Decedent, against the hazards Plaintiff's Decedent encountered at SEVC and the type of harm he suffered – specifically, contracting viral infections from other residents and/or staff and dying from the virus.

240.   Defendant Blackwood, as Commandant for SEVC, negligently, recklessly, carelessly, and wantonly violated these regulations in the following ways:

   a.   By inadequately ensuring that residents were not neglected, intimidated, physically or verbally abused, and mistreated, as required by 55 Pa. Code § 2600.42(b), as pled herein;

   b.   By inadequately ensuring that residents were treated with dignity and respect, as required by 55 Pa. Code § 2600.42(c), as pled herein;

   c.   By inadequately ensuring that all residents received assistance in accessing health services, as required by 55 Pa. Code § 2600.42(i), as pled herein;

   d.   By inadequately ensuring that residents were not deprived of their rights, as required by 55 Pa. Code § 2600.43(a), as pled herein;

   e.   By inadequately ensuring that sufficient staff was provided to meet the needs of residents, as required by 55 Pa. Code § 2600.60(a), as pled herein;

      f.     By inadequately and improperly ensuring staff were trained, including that on infection control, as required by 55 Pa. Code § 2600.65(d)(3)(xv), as pled herein;

      g.    By inadequately ensuring that sanitary conditions were maintained in the facility, as required by 55 Pa. Code § 2600.85(a), as pled herein;

      h.    By inadequately ensuring that all residents were assisted in securing medical care when residents' health statuses declined, as required by 55 Pa. Code § 2600.142(a), as pled herein;

      i.     By inadequately and improperly maintaining documents of residents' needs for medical care, as required by 55 Pa. Code § 2600.142(c), as pled herein;

      j.     By inadequately and improperly providing Plaintiff's Decedent with encouragement and assistance they needed to develop and maintain maximum independence as self-determinations, in derogation of 55 Pa. Code § 2600.1, as pled herein;

      k.    By inadequately providing Plaintiff's Decedent with assistance with activities of daily living, as required by 55 Pa. Code § 2600.23, as pled herein;

      l.     By inadequately providing Plaintiff's Decedent with assistance with personal hygiene, as required by 55 Pa. Code § 2600.24, as pled herein; and,

      m.    By inadequately revising Plaintiff's Decedent support plans upon changes in Plaintiff's needs, as required by 55 Pa. Code § 2600.227(c), as pled herein.

241.    The above-noted regulations are designed and intended to protect the interests of persons such as Plaintiff's Decedent, who are residents in facilities such as SEVC.

242.    The above-noted regulations are designed and intended to protect persons, such as Plaintiff's Decedent, against the hazards he encountered and the harm he suffered while a resident at SEVC.

243.   As a direct and proximate result of the negligent, reckless, careless, and wanton acts and omissions of Defendant Blackwood, as set forth above, Plaintiff's Decedent suffered the following damages:

      a.   Plaintiff's Decedent experienced pain, suffering, infirmity, deterioration, debilitation, loss of enjoyment of life, anxiety, and isolation/confinement from contracting and being treated for the COVID-19; and,

      b.   Plaintiff's Decedent incurred hospital, medical, and nursing expenses to be treated for the COVID-19 virus and its sequelae and effects.

244.   Furthermore, because the negligence of Defendant Blackwood went beyond ordinary negligence into gross negligence, recklessness, and wanton conduct, Plaintiff is entitled to recover punitive damages.

WHEREFORE, Plaintiff, Barbara Fronheiser, Individually and as Administratrix of the Estate of James Hatt, Deceased, demands compensatory damages from the Defendant Rohan Blackwood, in his individual capacity, in an amount in excess of the jurisdictional arbitration limits, together with interest, and any other relief this Honorable Court deems appropriate.

### COUNT VIII:
### <u>NEGLIGENCE</u>

**Barbara Fronheiser, Individually and as Administratrix**
**of the Estate of James Hatt, Deceased**
**vs.**
**Deborah Mullane**

245.   The averments of the previous paragraphs are incorporated by reference as if fully set forth.

246.   At all relevant times, Defendant Mullane acted within the course and scope of her employment as the DON at SEVC.

247.     Defendant Mullane is a "Commonwealth party" as described in 42 Pa. C.S.A. § 8522 who oversaw and provided medical care, both personal and nursing services, to SEVC residents, including those on the fourth-floor personal care home unit; therefore, Defendant Mullane is liable to Plaintiff for damages under the medical-professional liability exception to sovereign immunity.

248.     Defendant Mullane had a duty to act prudently and had a duty to provide reasonable and ordinary care and care services to Plaintiff's Decedent and all other SEVC residents.

249.     Defendant Mullane had a duty to ensure that all persons providing care within SEVC were competent to provide that care.

250.     Mullane had a duty to formulate, adopt, and enforce adequate rules and policies to ensure quality care for residents such as Plaintiff's Decedent.

251.     Defendant Mullane negligently, recklessly, carelessly, and wantonly breached the duties owed to Plaintiff's Decedent in the following particulars:

a.     By inadequately and improperly training and educating to caregiving staff on infection prevention and control, as pled herein;

b.     By inadequately and improperly ensuring all caregiving staff members attended and were properly trained on infection prevention and control, and by inadequately ensuring all staff were properly re-educated as required; as pled herein;

c.     By disseminating untrue information and/or withholding some or all relevant information from residents and their families about the spread of COVID-19 within SEVC, so as to prevent them from making informed decisions for the wellbeing of their loved ones in SEVC, as pled herein;

d.     By inadequately and improperly enforcing safe social distancing amongst staff and residents, as pled herein;

e.     By inadequately and improperly and improperly storing linens and soiled laundry, as pled herein;

f.      By inadequately and improperly ensuring all employees properly wore gloves and performed hand hygiene, as pled herein;

g.      By inadequately and improperly ensuring all employees knew of and properly followed guidelines for sanitizing medical equipment in between uses on different residents, as pled herein.

h.      By inadequately and improperly ensuring all employees properly used PPE and were trained on proper use of PPE, as pled herein;

i.      By inadequately and improperly ensuring all residents properly used PPE and were instructed on the proper use of PPE, as pled herein;

j.      By inadequately and improperly quarantining sick residents and residents who were exposed to other residents who were experiencing symptoms of COVID-19, as pled herein;

k.      By inadequately and improperly testing residents or staff for COVID-19 for a period of several months, as pled herein;

l.      By preventing sick residents from being transferred to the hospital, as pled herein;

m.      By implementing a policy that considered all residents and staff were "presumed positive" whether or not they were experiencing symptoms, as pled herein;

n.      By lying to the families regarding the status of the virus within the facility, as pled herein;

o.      By preventing the staff from speaking freely to the families and/or the media about the status of COVID-19 within SEVC and threatening termination of the staff if they spoke freely, as pled herein; and,

p.      By lying to the residents' families regarding the condition of their loved ones, as pled herein.

252.    At all relevant times, Defendant Mullane, as DON for SEVC, in addition to other duties set forth herein, had a duty to not violate the legal rights of any resident and had a duty to comply with all provisions of Title 55 of the Pennsylvania Administrative Code, Chapter § 2600.

253.    The above noted regulations are designed and intended to provide part of the standard of care by which personal care homes such as SEVC should operate.

254.    These regulations are designed and intended to protect the interests of residents, such a Plaintiff, against the hazards Plaintiff encountered at SEVC and the type of harm he suffered – specifically, contracting viral infections from other residents and/or staff.

255.    Defendant Mullane, as DON for SEVC, negligently, recklessly, carelessly, and wantonly violated these regulations in the following ways:

      a.      By inadequately ensuring that residents were not neglected, intimidated, physically or verbally abused, and mistreated, as required by 55 Pa. Code § 2600.42(b), as pled herein;

      b.      By inadequately ensuring that residents were treated with dignity and respect, as required by 55 Pa. Code § 2600.42(c), as pled herein;

      c.      By inadequately ensuring that all residents received assistance in accessing health services, as required by 55 Pa. Code § 2600.42(i), as pled herein;

      d.      By inadequately ensuring that residents were not deprived of their rights, as required by 55 Pa. Code § 2600.43(a), as pled herein;

      e.      By inadequately ensuring that sufficient staff was provided to meet the needs of residents, as required by 55 Pa. Code § 2600.60(a), as pled herein;

      f.      By inadequately and improperly ensuring staff were trained, including that on infection control, as required by 55 Pa. Code § 2600.65(d)(3)(xv), as pled herein;

g.    By inadequately ensuring that sanitary conditions were maintained in the facility, as required by 55 Pa. Code § 2600.85(a), as pled herein;

h.    By inadequately ensuring that all residents were assisted in securing medical care when residents' health statuses declined, as required by 55 Pa. Code § 2600.142(a), as pled herein;

i.    By inadequately and improperly maintaining documents of residents' needs for medical care, as required by 55 Pa. Code § 2600.142(c), as pled herein;

j.    By inadequately and improperly providing Plaintiff with encouragement and assistance he needed to develop and maintain maximum independence as self-determinations, in in derogation of 55 Pa. Code § 2600.1, as pled herein;

k.    By inadequately providing Plaintiff with assistance with activities of daily living, as required by 55 Pa. Code § 2600.23, as pled herein;

l.    By inadequately providing Plaintiff with assistance with personal hygiene, as required by 55 Pa. Code § 2600.24, as pled herein; and,

m.    By inadequately revising Plaintiff's support plans upon changes in Plaintiff's needs, as required by 55 Pa. Code § 2600.227(c), as pled herein.

256.    The above-noted regulations are designed and intended to protect the interests of persons, such as Plaintiff's Decedent, who are residents in facilities such as SEVC.

257.    The above-noted regulations are designed and intended to protect persons such as Plaintiff's Decedent against the hazards he encountered and the harm he suffered while being a resident at SEVC.

258.    As a direct and proximate result of the negligent, reckless, careless, and wanton acts and omissions of Defendant Mullane, as set forth above, Plaintiff's Decedent suffered the following damages:

    a.       Plaintiff's Decedent experienced pain, suffering, infirmity, deterioration, debilitation, loss of enjoyment of life, anxiety, and isolation/confinement from contracting and being treated for the COVID-19; and,

    b.       Plaintiff's Decedent incurred hospital, medical, and nursing expenses to be treated for the COVID-19 virus and its sequelae and effects.

259.    Furthermore, because the negligence of Defendant Mullane went beyond ordinary negligence into gross negligence, recklessness, and wanton conduct, Plaintiff is entitled to recover punitive damages.

WHEREFORE, Plaintiff, Barbara Fronheiser, Individually and as Administratrix of the Estate of James Hatt, Deceased, demands compensatory damages from the Defendant Deborah Mullane, in her individual capacity, in an amount in excess of the jurisdictional arbitration limits, together with interest, and any other relief this Honorable Court deems appropriate.

**COUNT IX:**
**<u>NEGLIGENCE: VICARIOUS LIABILITY</u>**

**Donna Scotti, Individually and as Executrix**
**of the Estate of Catherine Edginton, Deceased**
**vs.**
**SEVC**

260.    The averments of the previous paragraphs are incorporated by reference as if fully set forth.

261.    SEVC is a "Commonwealth party" as described in 42 Pa. C.S.A. § 8522 which provides medical care to the residents within its facility; therefore, SEVC is liable to Plaintiffs for damages under the medical-professional liability exception to sovereign immunity.

262.    SEVC employs individuals who work in a solely managerial and supervisory capacity, and who do not provide hands-on care to residents. These managerial and supervisory

health care personnel include (but are not limited to) positions such as the Commandant, Administrator, Assistant Administrator, Director of Nursing, and Assistant Director of Nursing.

263.    At all relevant times, the acts committed by SEVC's managerial and supervisory agents, servants, and/or health care personnel constitute "[a]cts of health care employees of Commonwealth party who is a doctor, dentist, nurse or related health care personnel…" as described in the medical-professional liability exception to sovereign immunity pursuant to 42 Pa. C.S.A. § 8522(b)(2).

264.    At all relevant times, SEVC acted by and through these managerial and supervisory agents, servants, and/or health care personnel, who were then and there acting within the course and scope of their employment. Accordingly, SEVC is vicariously liable for any negligence of these managerial and supervisory agents, servants, and/or employees.

265.    This cause of action is limited to SEVC's vicarious liability for the negligence of only these managerial/supervisory health care personnel who did not provide hands-on care to residents—such as the Commandant, Administrator, Assistant Administrator, Director of Nursing, and the Assistant Director of Nursing. Plaintiff does not seek to hold SEVC vicariously liable for the actions or inactions of SEVC's front-line caregiving nursing staff, whose members did the best they could to provide care in the dangerous atmosphere created by SEVC and SEVC's management.

266.    SEVC, by and through its supervisory and administrative health care personnel, specifically including the Commandant, Administrator, Assistant Administrator, Director of Nursing, and the Assistant Director of Nursing, had a duty to provide appropriate health care and health care services to residents in a reasonable manner and in accordance with appropriate standards of care.

267.   SEVC, by and through its managerial and supervisory health care personnel negligently, recklessly, carelessly, and wantonly breached their duties owed to the Plaintiff's Decedent in the following ways:

a.   By inadequately establishing and maintaining an infection prevention and control program ("IPCP") that provided a safe, sanitary and comfortable environment which prevented the development and transmission of communicable diseases and infections, namely the transmission of COVID-19, as pled herein;

b.   By inadequately establishing written standards, policies, and procedures for the above-mentioned IPCP, which should have specified a system of surveillance designed to identify possible communicable diseases before they can spread to other persons in the facility, to whom and when possible incidents of communicable disease or infections should be reported, precautions to be followed to prevent the spread of infections, when and how isolation should be used for a resident, and circumstances under which the facility must prohibit and prevent employees with communicable disease or infections from having direct contact with residents, as pled herein, as pled herein;

c.   By inadequately training and educating caregiving staff on infection prevention and control, as pled herein, as pled herein;

d.   By inadequately and improperly ensuring all caregiving staff members attended and were properly trained on infection prevention and control, and by failing to ensure all staff were properly re-educated as required; as pled herein, as pled herein;

e.   By inadequately communicating truthful information to residents and their families about the spread of COVID-19 within the SEVC facility, so as to allow them to make informed decisions for the wellbeing of their loved ones in the SEVC facility, as pled herein;

f.   By inadequately establishing and enforcing social distancing procedures to staff and residents, as pled herein;

g.    By improperly storing clean linens and soiled laundry, as pled herein;

h.    By inadequately enforcing the use of gloves and proper hand hygiene, as pled herein;

i.    By inadequately ensuring all employees properly used PPE and were trained on proper use of PPE, as pled herein;

j.    By inadequately ensuring all residents properly used PPE and were instructed on the proper use of PPE, as pled herein;

k.    By inadequately ensuring all employees knew of and properly followed guidelines for sanitizing medical equipment in between uses on different residents, as pled herein;

l.    By systemically and intentionally understaffing the facility, as pled herein;

m.    By housing sick residents and resident who were exposed to other residents who were experiencing symptoms with residents who were not sick, as pled herein;

n.    By exposing healthy residents to sick residents experiencing symptoms of COVID-19, as pled herein;

o.    By refusing to test any resident or staff for several months, as pled herein;

p.    By forcing the residents, including residents experiencing symptoms of COVID-19 and residents who were not experiencing symptoms of COVID-19 to eat in the same lunchroom for several months, as pled herein;

q.    By implementing a policy that considered all residents and staff as "presumed positive" whether or not they were experiencing symptoms of COVID-19, as pled herein;

r.    By lying to residents' families regarding the status of the virus within the facility, as pled herein;

s.    By lying to the residents' families regarding the condition of their loved ones, as pled herein; and,

t.  By refusing to transfer sick residents to the hospital promptly, as pled herein.

268.  At all relevant times, SEVC's managerial and supervisory personnel had a duty to not violate the legal rights of any resident and to comply with all provisions of Title 28, Pa. Administrative Code, Chapters 201 (General Operation of Long-Term Care Nursing Facilities) and 211 (Program Standards for Long-Term Care Nursing Facilities) and 42 C.F.R. §483 *et seq.* (Centers for Medicare & Medicaid Services, Department of Health and Human Services Requirements for Long Term Care Facilities).

269.  These state and federal regulations comprise part of the standard of care that facilities like SEVC must provide to its residents.

270.  These state and federal regulations are designed and intended to protect the interests of skilled nursing and long-term care residents such as the Plaintiff's Decedent.

271.  These state and federal regulations are designed and intended to protect the interests of skilled nursing and long-term care residents against the hazards the Plaintiff's Decedent encountered at SEVC and the type of harm she suffered – specifically, contracting viral infections from other residents and/or staff and dying from the virus.

272.  SEVC's managerial and supervisory health care personnel negligently, recklessly, carelessly, and wantonly violated these state and federal regulations in the following ways:

a.  By improperly and inadequately enforcing regulations relative to the level of health care and safety of residents, as required by 28 Pa. Code § 201.18(e)(1), as pled herein;

b.  By improperly and inadequately developing and enforcing adherence to policies and procedures to protect residents' rights, as required by 28 Pa. Code § 201.29(a), as pled herein;

c.    By improperly and inadequately training staff in proper implementation of policies and procedures, as required by 28 Pa. Code § 201.29(d), as pled herein;

d.    By improperly and inadequately treating Plaintiff's Decedent with consideration, respect, and full recognition of dignity and individuality, as required by 28 Pa. Code § 201.29(j), as pled herein;

e.    By improperly and inadequately reporting to the appropriate health agencies and appropriate Division of Nursing Care Facilities field office when a resident developed a reportable disease, as required by 28 Pa. Code § 211.1(a), as pled herein;

f.    By improperly and inadequately designing and implementing resident care policies to ensure the Plaintiff's Decedent's total medical needs were met and that she was protected from infection, as required by 28 Pa. Code § 211.10(d), as pled herein;

g.    By improperly and inadequately updating the facility's resident care policies as necessary to meet the total medical and psychosocial needs of SEVC's residents, as required by 28 Pa. Code §211.10, as pled herein;

h.    By the Director of Nursing's inadequacies in maintaining standards of accepted nursing practice, as required by 28 Pa. Code §211.12(d)(1), as pled herein;

i.    By the Director of Nursing's inadequacies in ensuring that the facility maintained proper nursing policy and procedure manuals, as required by 28 Pa. Code §211.12(d)(2), as pled herein;

j.    By the Director of Nursing's inadequacies in ensuring that the facility maintained proper methods for coordination of nursing services with other resident services, as required by 28 Pa. Code §211.12(d)(3), as pled herein;

k.    By the Director of Nursing's inadequacies in making proper recommendations for the number and levels of nursing personnel to be employed, as required by 28 Pa. Code §211.12(d)(4), as pled herein;

l.    By the Director of Nursing's inadequacies in providing adequate general supervision, guidance, and assistance in the implementation of residents' personal health programs to assure that preventative measures, treatments, and other health services were properly carried out, as required by 28 Pa. Code §211.12(d)(5), as pled herein;

m.    By improperly and inadequately protecting and promoting Plaintiff's Decedent's rights as a resident, as required by 42 C.F.R. § 483.10, as pled herein;

n.    By improperly and inadequately ensuring that every resident, including Plaintiff's Decedent and her representatives, could exercise her rights without interference, coercion, discrimination, or reprisal from the facility, as required by 42 C.F.R. § 483.10(b)(1), as pled herein;

o.    By improperly and inadequately treating each resident with respect and dignity and care in a manner and in an environment that promotes maintenance or enhancement of her quality of life, as required by 42 C.F.R. § 483.10(a)(1), as pled herein;

p.    By improperly and inadequately ensuring all residents, including Plaintiff's Decedent, received the necessary care and services to attain or maintain the highest practicable qualify of life, including physical, mental, and psychosocial well-being, as required by 42 C.F.R. § 483.24, as pled herein;

q.    By improperly and inadequately ensuring all residents, including Plaintiff's Decedent, received treatment and care in accordance with professional standards of practice, as required by 42 C.F.R. § 483.25, as pled herein;

r.    By improperly and inadequately maintaining an emergency preparedness plan that meets the minimum requirements, as set forth by 42 C.F.R. § 483.73, as pled herein;

s.    By improperly and inadequately maintaining an infection prevention and control program designed to provide a safe, sanitary, and comfortable environment and to help prevent the development and transmission of communicable diseases and infection, as required 42 C.F.R. § 483.80, as pled herein;

t.    By improperly and inadequately establishing a system for preventing, identifying, reporting, investigating, and controlling infections and communicable diseases for all residents, staff, volunteers, visitors, as required by 42 C.F.R. § 483.80(a)(1), as pled herein;

u.    By improperly and inadequately establishing a system of surveillance designed to identify possible communicable diseases or infections before they can spread to other persons in the facility, as required by 42 C.F.R. § 483.80(a)(2)(i), as pled herein;

v.    By improperly and inadequately establishing a system that specified standard and transmission-based precautions to be followed to prevent spread of infections, as required by 42 C.F.R. § 483.80(a)(2)(iii), as pled herein;

w.    By improperly and inadequately establishing a system that specified when and how isolation should be used for a resident, including the type and duration of the isolation, as required by 42 C.F.R. § 483.80(a)(2)(iv), as pled herein;

x.    By improperly and inadequately establishing a system that specified the circumstances under which the facility must prohibit employees with a communicable disease from direct contact with residents, if direct contract will transmit the disease, as required by 42 C.F.R. § 483.80(a)(2)(v), as pled herein; and,

y.    By the designated Infection Preventionist(s)' inadequacies of administering the facility's IPCP in accordance with the requirements of 42 C.F.R. § 483.80, as pled herein.

273.    As a direct and proximate result of the negligent, reckless, careless, and wanton acts and omissions of SEVC's managerial and supervisory health care personnel, as set forth above, SEVC's caregiving staff was unable to contain and control the spread of COVID within SEVC's walls.

274.    As a direct and proximate result of the negligent, reckless, careless, and wanton acts and omissions of SEVC's managerial and supervisory health care personnel, as set forth above, Plaintiff's Decedent was exposed to and contracted COVID-19.

275.    As a direct and proximate result of the negligent, reckless, careless, and wanton acts and omissions of SEVC's managerial and supervisory health care personnel, as set forth above, Plaintiff's Decedent suffered the following damages:

      a.      Plaintiff's Decedent experienced pain, suffering, infirmity, deterioration, debilitation, loss of enjoyment of life, anxiety, and isolation/confinement from contracting and being treated for the COVID-19; and,

      b.      Plaintiff's Decedent incurred hospital, medical, and nursing expenses to be treated for the COVID-19 virus and its sequelae and effects.

276.    Furthermore, because the negligence of SEVC's managerial and supervisory health care personnel went beyond ordinary negligence into gross negligence, recklessness, and wanton conduct, Plaintiff is entitled to recover punitive damages.

WHEREFORE, Plaintiff Donna Scotti, Individually and as Executrix of the Estate of Catherine Edginton, Deceased, claims damages against Defendant Pennsylvania Department of Military and Veterans Affairs, as owner and operator of Southeastern Veterans' Center, and demands compensatory damages from the Defendant in an amount in excess of the jurisdictional

arbitration limits, together with interest, and any other relief this Honorable Court deems appropriate.

**COUNT X:**
**<u>NEGLIGENCE: VICARIOUS LIABILITY</u>**

**Barbara Fronheiser, Individually and as Administratrix**
**of the Estate of James Hatt, Deceased**
**vs.**
**SEVC**

277.     The averments of the previous paragraphs are incorporated by reference as if fully set forth.

278.     SEVC is a "Commonwealth party" as described in 42 Pa. C.S.A. § 8522 which provides medical care, both personal and nursing services, to its residents, including those on the fourth-floor personal care home unit; therefore, SEVC is liable to Plaintiff for damages under the medical-professional liability exception to sovereign immunity.

279.     SEVC's personal care unit provided medical and nursing care to the residents within the unit.

280.     Specifically, the same managerial and supervisory health care roles within the skilled nursing facility oversaw the residents in the personal care home unit of SEVC.

281.     SEVC employs individuals who work in a solely managerial and supervisory health care capacity, and who do not generally provide hands-on care to residents. These managerial and supervisory health care personnel include positions such as the Commandant, Administrator, Assistant Administrator, Director of Nursing, and Assistant Director of Nursing.

282.     At all relevant times, SEVC acted by and through these managerial and supervisory agents, servants, and/or employees, who were then and there acting within the course and scope of

their employment. Accordingly, SEVC is vicariously liable for any negligence of these managerial and supervisory agents, servants, and/or employees.

283. This cause of action is limited to SEVC's vicarious liability for the negligence of only these managerial/supervisory health care personnel, such as the Administrator, Assistant Administrator, Director of Nursing, and the Assistant Director of Nursing. Plaintiffs do not seek to hold SEVC vicariously liable for the actions or inactions of SEVC's front-line caregiving nursing staff, whose members did the best they could to provide care in the dangerous atmosphere created by SEVC and SEVC's management.

284. SEVC's managerial and supervisory health care personnel had the responsibility and authority to make decisions for the facility in areas such as: monitoring resident acuity levels and staffing sufficiency to meet each resident's needs; admitting and discharging residents to and from the facility; and creating and enforcing SEVC's policies and procedures.

285. SEVC's managerial and supervisory health care personnel – such as the Commandant, Administrator, Assistant Administrator, Director of Nursing, and Assistant Director of Nursing – had a duty to make these decisions and carry out these functions with reasonable care.

286. These types of managerial decisions had a direct impact on the quality of care SEVC was able to provide to its residents.

287. SEVC's managerial and supervisory health care personnel had a duty to ensure that all persons providing resident care within SEVC were competent and adequately trained to provide reasonable care to SEVC's residents.

288. SEVC's managerial and supervisory health care personnel had a duty to formulate, adopt, and enforce rules and policies to ensure reasonable care for SEVC's residents.

289.    SEVC's managerial and supervisory health care personnel had a duty to supervise the nursing and caregiving staff to ensure that SEVC's policies and procedures, and basic infection protocol, were being followed.

290.    SEVC's managerial and supervisory health care personnel negligently, recklessly, carelessly, and wantonly breached their duties owed to the Plaintiff's Decedent in the following ways:

    a.    By inadequately ensuring that residents were not neglected, intimidated, physically or verbally abused, and mistreated, as required by 55 Pa. Code § 2600.42(b), as pled herein;

    b.    By inadequately ensuring that residents were treated with dignity and respect, as required by 55 Pa. Code § 2600.42(c), as pled herein;

    c.    By inadequately ensuring that all residents had access to a telephone in the home to make calls in privacy, as required by 55 Pa. Code § 2600.42(e), as pled herein;

    d.    By inadequately ensuring that all residents received assistance in accessing health services, as required by 55 Pa. Code § 2600.42(i), as pled herein;

    e.    By inadequately ensuring that residents weren't deprived of their rights, as required by 55 Pa. Code § 2600.43(a), as pled herein;

    f.    By inadequately ensuring that sufficient staff was provided to meet the needs of residents, as required by 55 Pa. Code § 2600.60(a), as pled herein;

    g.    By inadequately ensuring staff training, including that on infection control, as required by 55 Pa. Code § 2600.65(d)(3)(xv), as pled herein;

    h.    By inadequately ensuring that sanitary conditions were maintained in the facility, as required by 55 Pa. Code § 2600.85(a), as pled herein;

    i.    By inadequately ensuring that all residents were assisted in securing medical care when residents' health statuses

declined, as required by 55 Pa. Code § 2600.142(a), as pled herein;

j.  By inadequately documenting residents' need for medical care, as required by 55 Pa. Code § 2600.142(c), as pled herein;

k.  By inadequately providing Plaintiff's Decedent with encouragement and assistance they needed to develop and maintain maximum independence as self-determination, in derogation of 55 Pa. Code § 2600.1, as pled herein;

l.  By inadequately providing Plaintiff's Decedent with assistance with activities of daily living, as required by 55 Pa. Code § 2600.23, as pled herein;

m.  By inadequately providing Plaintiff's Decedent with assistance in maintaining personal hygiene, as required by 55 Pa. Code § 2600.24, as pled herein; and,

n.  By inadequately revising Plaintiff's Decedent support plans upon changes in Plaintiff's needs, as required by 55 Pa. Code § 2600.227(c), as pled herein.

291.  As a direct and proximate result of the negligent, reckless, careless, and wanton acts and omissions of SEVC's managerial and supervisory health care personnel, as set forth above, SEVC's caregiving staff was unable to contain and control the spread of COVID within SEVC's walls.

292.  As a direct and proximate result of the negligent, reckless, careless, and wanton acts and omissions of SEVC's managerial and supervisory health care personnel, as set forth above, Plaintiff was exposed to and contracted COVID-19 and ultimately died from the virus.

293.  As a direct and proximate result of the negligent, reckless, careless, and wanton acts and omissions of SEVC's managerial and supervisory health care personnel, as set forth above, the Plaintiff's Decedent suffered the following damages:

a.  Plaintiff's Decedent experienced pain, suffering, infirmity, deterioration, debilitation, loss of enjoyment of life, anxiety,

and isolation/confinement from contracting and being treated for the COVID-19; and,

b.   Plaintiff's Decedent incurred hospital, medical, and nursing expenses to be treated for the COVID-19 virus and its sequelae and effects.

WHEREFORE, Plaintiff, Barbara Fronheiser, Individually and as Administratrix of the Estate of James Hatt, Deceased, claims damages of the Pennsylvania Department of Military and Veterans Affairs, as owner and operator of Southeastern Veterans' Center, and demands compensatory damages from the Defendant in an amount in excess of the jurisdictional arbitration limits, together with interest, and any other relief this Honorable Court deems appropriate.

## COUNT XI:
## CORPORATE NEGLIGENCE

**Donna Scotti, Individually and as Executrix**
**of the Estate of Catherine Edginton, Deceased**
**vs.**
**SEVC**

371.   The averments of the previous paragraphs are incorporated by reference as if fully set forth.

372.   SEVC is a "Commonwealth party" as described in 42 Pa. C.S.A. § 8522 which provides medical care to the residents within its facility; therefore, SEVC is directly liable to Plaintiff for damages under the medical-professional liability exception to sovereign immunity.[31]

---

[31] Plaintiff pleads this cause of action with the understanding that so-called "corporate negligence" claims against Commonwealth parties are not currently considered within the "medical professional" liability exception. *See e.g. Moser v. Heistand,* 681 A.2d 1322, 1326 (Pa. 1996); *Byrne v. Dept. of Military and Veterans Affairs,* 2019 WL 1284539, *3 (Pa. Cmwlth 2019); *Cornish v. City of Philadelphia,* 2015 WL 4931758 *7 (E.D. Pa. 2015); *Lor v. Com.,* 2000 WL 186839 *4 (E.D. Pa. 2000). However, Plaintiff pleads this cause of action with the good faith belief that current caselaw incorrectly interprets the immunity statutes, and the Pennsylvania Supreme Court will determine as such. *See Moser v. Heistand,* 681 A.2d 1322, 1327 (Pa. 1996) (Nigro, J., dissenting).

373.    SEVC exercised complete control over all aspects of the operation and management of SEVC prior to and during the COVID outbreak at SEVC, including, but not limited to: hiring and training caregiving staff; monitoring resident acuity levels and staffing sufficiently to meet each resident's needs; admitting and discharging residents to and from the facility; and creating and enforcing written policies and procedures to provide for the safety and well-being of all residents.

374.    Each of these managerial and operational functions had a direct impact on the quality of care provided to the Plaintiff's Decedent and other residents in SEVC.

375.    SEVC had a duty to act prudently and had a duty to provide reasonable and ordinary care and care services to Plaintiff's Decedent.

376.    SEVC had a duty to provide caregiving staff with sufficient personal protective equipment, sanitation and hygiene products, and medical tools to prevent cross-contamination and the spread of infection to residents, including Plaintiff's Decedent, and other staff.

377.    SEVC had a duty to ensure that all persons providing care within the SEVC facility were competent to provide that care.

378.    SEVC had a duty to oversee all medical care provided to its residents, including Plaintiffs' Decedents.

379.    SEVC had a duty to formulate, adopt, and enforce adequate rules and policies to ensure quality care for residents at SEVC, such as Plaintiff's Decedent.

380.    SEVC had a duty to ensure that SEVC was sufficiently staffed to meet the needs of its residents, including Plaintiff's Decedent.

381.    SEVC had a duty to enforce its policies and procedures regarding infectious disease and cross-contamination.

382.    Defendant SEVC negligently, recklessly, carelessly, and wantonly breached its

duties owed to the Catherine Edginton:

a.    By inadequately establishing and maintain an infection
prevention and control program ("IPCP") that provided a
safe, sanitary and comfortable environment which prevents
the development and transmission of communicable
diseases and infections, namely the transmission of COVID-
19, as pled herein;

b.    By inadequately establishing written standards, policies, and
procedures for above-mentioned IPCP, which should have
specified a system of surveillance designed to identify
possible communicable diseases before they can spread to
other persons in the facility, to whom and when possible
incidents of communicable disease or infections should be
reported, precautions to be followed to prevent the spread of
infections, when and how isolation should be used for a
resident, and circumstances under which the facility must
employees with communicable disease or infections from
having direct contact with residents, as pled herein;

c.    By inadequately providing staff training and education on
infection prevention and control, which is required to occur
at least annually as in-service training, as pled herein;

d.    By inadequately ensuring all staff attended and were
properly trained on infection prevention and control and
failing to ensure all staff were properly re-educated as
required, as pled herein;

e.    By inadequately ensuring that the Commandant, Rohan
Blackwood, and Director of Nursing, Deborah Mullane,
were properly overseeing the facility in providing care to
residents, as pled herein;

f.    By inadequately ensuring that the Commandant, Rohan
Blackwood, and Director of Nursing, Deborah Mullane,
were properly safeguarding that the quality of care provided
met all applicable standards, as pled herein;

g.    By inadequately ensuring that the Commandant, Rohan
Blackwood, and Director of Nursing, Deborah Mullane,
were properly auditing infection control procedures, as
required, as pled herein;

h.      By inadequately communicating and discussing important medical information to the families of residents, so as to allow them to make necessary medical decisions on behalf of their resident family members, as pled herein;

i.      By inadequately keeping families, outside medical professionals, the Pennsylvania Department of Health, and the general public up to date with the health situation inside the facility, as pled herein;

j.      By inadequately requesting assistance from the proper authorities when it became apparent that COVID-19 was spreading throughout the facility, as pled herein;

k.      By inadequately testing residents and staff for COVID-19 so as to properly separate positive individuals from those who had not been exposed to the virus, as pled herein;

l.      By creating an extreme risk of exposure and danger to residents by presuming the entire facility, all residents, and all staff were positive for COVID-19 when in fact they were not all infected, as pled herein;

m.      By inadequately establishing and enforcing social distancing procedures were maintained by staff, as pled herein;

n.      By improperly storing clean linens and soiled laundry, as pled herein;

o.      By inadequately providing proper supplies to perform handwashing, as pled herein;

p.      By inadequately ensuring sinks are accessible to perform handwashing, as pled herein;

q.      By inadequately and improperly storing biohazardous waste, as pled herein;

r.      By inadequately ensuring all employees properly wear gloves and perform hand hygiene, as pled herein;

s.      By inadequately ensuring all employees had access to and properly used PPE, as pled herein;

78

t.     By inadequately ensuring all employees knew of and properly followed sanitary guidelines for sanitizing medical equipment in between uses on different residents, as pled herein;

u.     By inadequately maintaining a clean and sanitary environment, the lack of which created the potential for cross-contamination and the spread of diseases and infections, as pled herein; and,

v.     By improperly recognizing and appreciating the extreme risk of the spread and cross-contamination of COVID-19 to residents, who due to age, pre-existing conditions, and living arrangements are already some of the most vulnerable in our communities.

383.    At all relevant times, SEVC had a duty to not violate the legal rights of any resident and to comply with all provisions of Title 28, Pa. Administrative Code, Chapters 201 (General Operation of Long-Term Care Nursing Facilities) and 211 (Program Standards for Long-Term Care Nursing Facilities) and 42 C.F.R. §483 *et seq.* (Centers for Medicare & Medicaid Services, Department of Health and Human Services Requirements for Long Term Care Facilities).

384.    These state and federal regulations comprise part of the standard of care that facilities like SEVC must provide to its residents, including Plaintiff's Decedent.

385.    These state and federal regulations are designed and intended to protect the interests of skilled nursing and long-term care residents, such as Plaintiff's Decedent.

386.    These state and federal regulations are designed and intended to protect the interests of skilled nursing and long-term care residents against the hazards Plaintiff's Decedent encountered at SEVC and the type of harm she suffered – specifically, contracting viral infections from other residents and/or staff and ultimately dying from the virus.

387.    SEVC negligently, recklessly, and wantonly breached its duties owed to the Plaintiff's Decedent in the following ways:

a. By improperly and inadequately electing an effective governing body to adopt and enforce rules for the health care and safety of the residents, as required by 28 Pa. Code § 201.18, as pled herein;

b. By inadequately conducting ongoing coordinated educational programs for the development and improvement of skills of the facility's personnel, including training related to problems, needs, and rights of the residents, as required by 28 Pa. Code § 201.20(a), as pled herein;

c. By inadequately conducting in-service training at least annually which includes infection prevention and control, as required by 28 Pa. Code §201.20(c), as pled herein;

d. By admitting or re-admitting residents to SEVC with disease in the communicable stage when the facility did not have the capability to care for the needs of the resident, as prohibited by 28 Pa. Code §201.24(d), as pled herein;

e. By inadequately and improperly training staff in the implementation of policies and procedures, as required by 28 Pa. Code § 201.29(d), as pled herein;

f. By inadequately treating Plaintiff's Decedent with consideration, respect, and full recognition of dignity and individuality, as required by 28 Pa. Code § 201.29(j), as pled herein;

g. By inadequately reporting to the appropriate health agencies and appropriate Division of Nursing Care Facilities filed office when a resident developed a reportable disease, as required by 28 Pa. Code § 211.1(a), as pled herein;

h. By inadequately designing and implementing resident care policies to ensure the Plaintiff's Decedent total medical needs were met and that she was protected from infection, as required by 28 Pa. Code § 211.10(d), as pled herein;

i. By inadequately updating the facility's resident care policies as necessary to meet the total medical and psychosocial needs of SEVC's residents, as required by 28 Pa. Code §211.10, as pled herein;

j.      By inadequately providing services by a sufficient number of nursing personnel on a 24-hour basis to provide nursing care to meet the needs of all residents, as required by 28 Pa. Code § 211.12, as pled herein;

k.      By inadequately protecting and promoting Plaintiff's Decedent's resident rights, as required by 42 C.F.R. § 483.10, as pled herein;

l.      By inadequately treating each resident in a manner and in an environment that promoted maintenance or enhancement of his or her quality of life, as required by 42 C.F.R. § 483.10(a)(1), as pled herein;

m.      By inadequately and improperly notifying Plaintiff's Decedent representatives when there were significant changes in Plaintiff's Decedent's physical statuses, as required by 42 C.F.R. § 483.10(g)(14), as pled herein;

n.      By inadequately providing residents with a safe, clean, comfortable, and homelike environment, as required by 42 C.F.R. § 483.10(i), as pled herein;

o.      By inadequately providing housekeeping and maintenance services necessary to maintain a sanitary, orderly, and comfortable interior, as require by 42 C.F.R. § 483.10(i)(2), as pled herein;

p.      By discouraging residents from communicating with federal, state, or local officials, as prohibited by 42 C.F.R. § 483.10(k), as pled herein;

q.      By inadequately conducting a comprehensive assessment for the residents, including Plaintiff's Decedent, after significant changes in their condition, as required by 42 C.F.R. § 483.20, as pled herein;

r.      By inadequately ensuring all residents, including the Plaintiff's Decedent, received the necessary care and services to attain or maintain the highest practicable qualify of life, including physical, mental, and psychosocial well-being, as required by 42 C.F.R. § 483.24, as pled herein;

s.      By inadequately ensuring all residents, including Plaintiff's Decedent, received treatment and care in accordance with

professional standards of practice, as required by 42 C.F.R. § 483.25, as pled herein;

t.      By inadequately providing sufficient nursing staff with the appropriate competencies and skill sets to provide nursing and related services to assure resident safety and attain or maintain the highest practicable physical, mental, and psychosocial well-being, as determined by resident assessments and individual plans of care and considering the number, acuity and diagnoses of the facility's resident population, as required by 42 C.F.R. § 483.35, as pled herein;

u.      By inadequately providing services by sufficient registered nurses on a 24-hour basis to provide nursing care to the plaintiff residents in accordance with their care plans, as required by 42 C.F.R. § 483.35(b), as pled herein;

v.      By inadequately obtaining diagnostic services to meet the needs of its residents, including Plaintiff's Decedent, as required by 42 C.F.R. § 483.50(b), as pled herein;

w.      By inadequately administering the SEVC facility in such a way that enabled it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, as required by 42 C.F.R. § 483.70, as pled herein;

x.      By inadequately operating to provide services in compliance with all applicable Federal, State, and local laws, regulations, and codes, and with accepted professional standards and principles, as required by 42 C.F.R. § 483.70, as pled herein;

y.      By inadequately conducting and documenting a facility-wide assessment to determine what resources were necessary to care for the facility's residents competently during both day-to-day operations and emergencies and to review and update this assessment whenever there was any change that would require a substantial modification to any part of this assessment, and for this assessment to include the care required by the resident population considering the types of diseases and overall acuity present within that population, as required by 42 C.F.R. § 483.70(e), as pled herein;

z.      By inadequately establishing and maintaining an emergency preparedness plan that meets the requirements of 42 C.F.R. § 483.73, as pled herein;

aa.     By inadequately establishing and maintaining an infection prevention and control program designed to provide a safe, sanitary, and comfortable environment and to help prevent the development and transmission of communicable diseases and infection, as required 42 C.F.R. § 483.80, as pled herein;

bb.     By inadequately establishing a system for preventing, identifying, reporting, investigating, and controlling infections and communicable diseases for all residents, staff, volunteers, visitors, as required by 42 C.F.R. § 483.80(a)(1), as pled herein;

cc.     By inadequately establishing a system of surveillance designed to identify possible communicable diseases or infections before they can spread to other persons in the facility, as required by 42 C.F.R. § 483.80(a)(2)(i), as pled herein;

dd.     By inadequately establishing a system which specified standard and transmission-based precautions to be followed to prevent spread of infections, as required by 42 C.F.R. § 483.80(a)(2)(iii), as pled herein;

ee.     By inadequately establishing a system which specified when and how isolation should be used for a resident, including the type and duration of the isolation, as required by 42 C.F.R. § 483.80(a)(2)(iv), as pled herein;

ff.     By inadequately establishing a system which specified the circumstances under which the facility must prohibit employees with a communicable disease from direct contact with residents, if direct contract will transmit the disease, as required by 42 C.F.R. § 483.80(a)(2)(v), as pled herein;

gg.     By inadequately complying with the requirements of 42 C.F.R. § 483.80(g)(3) for informing residents and their families of Covid-10 occurrences in the facility, as pled herein;

hh.   By inadequately providing a safe, functional, sanitary, and comfortable environment to residents, staff, and the public, as required by 42 C.F.R. § 483.90, as pled herein;

ii.   By inadequately developing, implementing, and maintaining an effective training program for all new and existing staff, individuals providing services under a contractual arrangement, and volunteers, as required by 42 C.F.R. § 483.95, as pled herein; and,

jj.   By inadequately including as part of its infection prevention and control program mandatory training that includes the written standards, policies, and procedures for the program, as required by 42 C.F.R. § 483.95(e), as pled herein.

388.   As a direct and proximate result of the negligent, reckless, careless, and wanton acts and omissions of SEVC, as set forth above, SEVC's caregiving staff was unable to contain and control the spread of COVID within SEVC's walls.

389.   As a direct and proximate result of the negligent, reckless, careless, and wanton acts and omissions of SEVC, as set forth above, Plaintiff's Decedent was exposed to and contracted COVID-19 and ultimately died from the virus.

390.   As a direct and proximate result of the negligent, reckless, careless, and wanton conduct and omissions of SEVC, as set forth above, Plaintiff claims the following damages:

a.   The pain, suffering, infirmity, deterioration, debilitation, confinement, loss of enjoyment of life, and anxiety of Plaintiff's Decedent related to her injuries and treatment; and,

b.   Hospital, medical, and nursing expenses.

WHEREFORE, Plaintiff Donna Scotti, Individually and as Executrix of the Estate of Catherine Edginton, Deceased, claims damages of the Pennsylvania Department of Military and Veterans Affairs,   as owner and operator of Southeastern Veterans' Center, and demands

compensatory damages from the Defendant in an amount in excess of the jurisdictional arbitration limits, together with interest, and any other relief this Honorable Court deems appropriate.

## COUNT XII:
## <u>CORPORATE NEGLIGENCE</u>

**Barbara Fronheiser, Individually and as Administratrix**
**of the Estate of James Hatt, Deceased**
**vs.**
**SEVC**

391.    The averments of the previous paragraphs are incorporated by reference as if fully set forth.

392.    SEVC is a "Commonwealth party" as described in 42 Pa. C.S.A. § 8522 which provides medical care to the residents within its facility; therefore, SEVC is directly liable to Plaintiff for damages under the medical-professional liability exception to sovereign immunity.[32]

393.    At all relevant times, SEVC provided medical care, both personal and nursing services, to SEVC residents, including those on the fourth-floor personal care home unit.

394.    SEVC directly had a duty to act prudently and had a duty to provide reasonable and ordinary care and care services to all residents, including Plaintiffs' Decedents.

395.    SEVC directly had a duty to ensure that all persons providing care within SEVC were competent to provide that care.

---

[32] Plaintiff pleads this cause of action with the understanding that so-called "corporate negligence" claims against Commonwealth parties are not currently considered within the "medical professional" liability exception. *See e.g. Moser v. Heistand,* 681 A.2d 1322, 1326 (Pa. 1996); *Byrne v. Dept. of Military and Veterans Affairs,* 2019 WL 1284539, *3 (Pa. Cmwlth 2019); *Cornish v. City of Philadelphia,* 2015 WL 4931758 *7 (E.D. Pa. 2015); *Lor v. Com.,* 2000 WL 186839 *4 (E.D. Pa. 2000). However, Plaintiff pleads this cause of action with the good faith belief that current caselaw incorrectly interprets the immunity statutes. *See Moser v. Heistand,* 681 A.2d 1322, 1327 (Pa. 1996) (Nigro, J., dissenting).

396.     SEVC directly had a duty to oversee all persons who practice medicine within their facility.

397.     Defendant SEVC directly had a duty to formulate, adopt, and enforce adequate rules and policies to ensure quality care for residents such as Plaintiffs' Decedents.

398.     Defendant SEVC negligently, recklessly, carelessly, and wantonly breached its duties owed to James Hatt in the following particulars:

    a.    By inadequately establishing and maintain an infection prevention and control program ("IPCP") that provided a safe, sanitary and comfortable environment which prevents the development and transmission of communicable diseases and infections, namely the transmission of COVID-19, as pled herein;

    b.    By inadequately establishing written standards, policies, and procedures for above-mentioned IPCP, which should have specified a system of surveillance designed to identify possible communicable diseases before they can spread to other persons in the facility, to whom and when possible incidents of communicable disease or infections should be reported, precautions to be followed to prevent the spread of infections, when and how isolation should be used for a resident, and circumstances under which the facility must employees with communicable disease or infections from having direct contact with residents, as pled herein;

    c.    By inadequately providing staff training and education on infection prevention and control, which is required to occur at least annually as Inservice training, as pled herein;

    d.    By inadequately ensuring all staff attended and were properly trained on infection prevention and control and failing to ensure all staff were properly re-educated as required, as pled herein;

    e.    By inadequately ensuring that the Commandant, Rohan Blackwood, and Director of Nursing, Deborah Mullane, were properly overseeing the facility in providing care to residents, as pled herein;

f.   By inadequately ensuring that the Commandant, Rohan Blackwood, and Director of Nursing, Deborah Mullane, were properly safeguarding that the quality of care provided met all applicable standards, as pled herein;

g.   By inadequately ensuring that the Commandant, Rohan Blackwood, and Director of Nursing, Deborah Mullane, were properly auditing infection control procedures, as required, as pled herein;

h.   By inadequately communicating and discussing important medical information to the families of residents, so as to allow them to make necessary medical decisions on behalf of their resident family members, as pled herein;

i.   By inadequately keeping families, outside medical professionals, the Pennsylvania Department of Health, and the general public up to date with the health situation inside the facility, as pled herein;

j.   By inadequately requesting assistance from the proper authorities when it became apparent that COVID-19 was spreading throughout the facility, as pled herein;

k.   By inadequately testing residents and staff for COVID-19 so as to properly separate positive individuals from those who had not been exposed to the virus, as pled herein;

l.   By creating an extreme risk of exposure and danger to residents by presuming the entire facility, all residents, and all staff were positive for COVID-19 when in fact they were not all infected, as pled herein;

m.   By inadequately establishing and enforcing social distancing procedures were maintained by staff, as pled herein;

n.   By improperly storing clean linens and soiled laundry, as pled herein;

o.   By inadequately providing proper supplies to perform handwashing, as pled herein;

p.   By inadequately ensuring sinks are accessible to perform handwashing, as pled herein;

q.   By inadequately and improperly storing biohazardous waste, as pled herein;

r.   By inadequately ensuring all employees properly wear gloves and perform hand hygiene, as pled herein;

s.   By inadequately ensuring all employees had access to and properly used PPE, as pled herein;

t.   By inadequately ensuring all employees knew of and properly followed sanitary guidelines for sanitizing medical equipment in between uses on different residents, as pled herein;

u.   By inadequately maintaining a clean and sanitary environment, the lack of which created the potential for cross-contamination and the spread of diseases and infections, as pled herein; and,

v.   By improperly recognizing and appreciating the extreme risk of the spread and cross-contamination of COVID-19 to residents, who due to age, pre-existing conditions, and living arrangements are already some of the most vulnerable in our communities, as pled herein.

399.   At all relevant times, SEVC, as well as its authorized agents, servants, and/or employees had a duty to not violate the legal rights of any resident and had a duty to comply with all provisions of Title 55 of the Pennsylvania Administrative Code, Chapter § 2600.

400.   The above-noted regulations are designed and intended to protect the interest of persons, such as Plaintiffs' Decedents, who were residents in facilities such as SEVC.

401.   The above-noted regulations are designed and intended to provide the standard of care that facilities like SEVC must provide to its residents.

402.   The above-noted regulations are designed and intended to protect the interests of persons, such as Plaintiffs' Decedents, against the hazards they encountered and the type of harm and injury they suffered while residents at SEVC – namely death as a result of COVID-19.

403.     SEVC and its supervisory personnel negligently, recklessly, carelessly, and wantonly violated these regulations in the following ways:

     a.     By inadequately establishing controls that are designed to ensure the achievement and maintenance of high standards of ethical and professional practice as required by 28 Pa. Code § 103.4(12), as pled herein;

     b.     By inadequately complying with the Patient's Bill of Rights requirements as required by 28 Pa. Code § 103.21 and § 103.22, as pled herein;

     c.     By inadequately ensuring that a sufficient number of registered professional nurses were on duty to provide residents such as the Plaintiffs, with appropriate nursing care, as required by 28 Pa. Code § 109.4, as pled herein;

     d.     By inadequately creating and implementing nursing Policy and Procedure Manuals, or by failing to follow the policies and procedures which were in place at SEVC, as required by 28 Pa. Code § 109.23, as pled herein;

     e.     By inadequately creating Nursing Care Plans for Plaintiffs' Decedents that included methods and approaches to provide successful methods for treatment, as required by 28 Pa. Code § 109.33, as pled herein;

     f.     By inadequately maintaining pertinent, accurate, and concise nursing notes and reports reflecting the progress of Plaintiffs' Decedents, as required by 28 Pa. Code § 109.36, as pled herein;

     g.     By inadequately establishing effective measures for the control and prevention of infections, as required by 28 Pa. Code § 146.1, as pled herein;

     h.     By inadequately developing written standards for sanitation and medical asepsis, as required by 28 Pa. Code § 146.1(b)(1), as pled herein;

     i.     By inadequately developing isolation procedures, as required by 28 Pa. Code § 146.1(2), as pled herein;

     j.     By inadequately developing a practical system to report, evaluate, and keep records of infections which original in the

facility among residents and personnel to trace the sources of infection, and to identify epidemic situations, as required by 28 Pa. Code § 146.1(4), as pled herein; and,

k.    By inadequately establishing procedures for the physical separation of all solation residents and failing to equip all isolation facilities in such a way as to enable good medical and nursing isolation techniques to be practiced and including handwashing facilities, as required by 28 Pa. Code § 146.2, as pled herein.

404.    As a direct and proximate result of the negligent acts and omissions of SEVC, as set forth above, Plaintiffs' Decedents were exposed to and contracted COVID-19 and eventually died as a result of the virus.

405.    As a direct and proximate result of the negligent, reckless, careless, and wanton conduct and omissions of SEVC, as set forth above, the personal care Plaintiff's Decedent, Catherine Edginton, claims the following damages:

a.    The pain, suffering, infirmity, deterioration, debilitation, confinement, loss of enjoyment of life, and anxiety of Plaintiff's Decedent related to his injuries and treatment; and,

b.    Hospital, medical, and nursing expenses.

WHEREFORE, Plaintiff, Barbara Fronheiser, Individually and as Administratrix of the Estate of James Hatt, Deceased, claims damages of the Pennsylvania Department of Military and Veterans Affairs, as owner and operator of Southeastern Veterans' Center, and demands compensatory damages from the Defendant in an amount in excess of the jurisdictional arbitration limits, together with interest, and any other relief this Honorable Court deems appropriate.

## COUNT XIII:
## <u>WRONGFUL DEATH</u>

### All Plaintiffs vs. All Defendants

406.    The averments of the previous paragraphs are incorporated by reference as if fully set forth.

407.    As a proximate result of all of the Defendants' conduct as above-described, all Plaintiffs' Decedents suffered injuries and died as a result of the poor care and treatment which they received by all of the Defendants as previously described. As such, Plaintiffs also have suffered the following damages:

a.      Money for funeral and estate expenses because of the death of the Plaintiffs[33];

b.      Loss of the services, assistance, guidance, counseling, companionship, and society of the Plaintiffs[34]; and,

c.      Financial support and all pecuniary benefits which they would have received from the Plaintiffs[35].

WHEREFORE, Plaintiffs, Barbara Fronheiser, Individually and as Administratrix of the Estate of James Hatt, Deceased, and Donna Scotti, Individually and as Executrix of the Estate of Catherine Edginton, Deceased claim damages of the Pennsylvania Department of Military and Veterans Affairs, as owner and operator of Southeastern Veterans' Center, Rohan Blackwood, in his individual capacity, and Deborah Mullane, in her individual capacity, and demand compensatory damages from the Defendants in an amount in excess of the jurisdictional arbitration limits, together with interest, and any other relief this Honorable Court deems appropriate.

---

[33] As to both Plaintiffs, Barbara Fronheiser, Individually and as Administratrix of the Estate of James Hatt, Deceased, and Donna Scotti, Individually and as Executrix of the Estate of Catherine Edginton, Deceased.
[34] As to Plaintiff,  Donna Scotti, Individually and as Executrix of the Estate of Catherine Edginton, Deceased, only.
[35] As to Plaintiff,  Donna Scotti, Individually and as Executrix of the Estate of Catherine Edginton, Deceased, only.

**A JURY TRIAL IS DEMANDED**

Dated: January 13, 2022                          Respectfully submitted,

 

                                    */s/ Robert F. Daley*                
ROBERT F. DALEY, ESQUIRE
PA Bar ID No.: 81992
D. AARON RIHN, ESQUIRE
PA Bar ID No.: 87572
ROBERT PEIRCE & ASSOCIATES, P.C.
707 Grant Street
Suite 125
Pittsburgh, PA 15219
Tel: 412-281-7229
Fax: 412-281-4229
Email: bdaley@peircelaw.com
        arihn@peircelaw.com

DANIEL C. LEVIN, ESQUIRE
PA Bar ID No.: 80013
LEVIN SEDRAN & BERMAN, LLC
510 Walnut Street
Suite 500
Philadelphia, PA 19106
Tel: 215-592-1500
Fax: 215-596-4663
Email: dlevin@lfsblaw.com

Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was filed via the Court's CM/ECF system on this 13th day of January 2022 and is available for download by all counsel of record.

_/s/  Robert F. Daley_
Robert F. Daley, Esquire
PA I.D. No.: 81992
ROBERT PEIRCE & ASSOCIATES, P.C.
707 Grant Street
Suite 125
Pittsburgh, PA 15219
Tel: 412-281-7229
Fax: 412-281-4229
bdaley@peircelaw.com